# CHARLESTON

WOODALL *v.* DARST, *Auditor.*

Submitted September 4, 1912.    Decided November 26, 1912.

1. STATUTES—*Appropriation Bills—Veto—Power of Governor.*
   Syllabus in *May* v. *Topping,* 65 W. Va. 656, re-affirmed. (p. 352).

2. MANDAMUS—*Issuance of Warrant—State Auditor—Defenses—Constitutionality of Appropriation—Objection.*

In a *mandamus* proceeding to compel the State Auditor to draw his warrant upon the Treasurer in favor of a person to whom the Legislature has appropriated money, the Auditor has the right to raise the constitutionality of the appropriation either by demurrer and motion to quash the alternative writ, or by answer. (p. 357).

3. STATES—*State Funds—Appropriation—Private Purposes—Moral Obligations.*

The Legislature is without power to levy taxes or appropriate public revenues for purely private purposes; but it has power to make any appropriation to a private person in discharge of a moral obligation of the state, and an appropriation for such purpose is for a public, and not a private purpose. (p. 353).

4. SAME—*Fiscal Management—Appropriation—Injury to Militiamen.*

The Legislature has power to provide for compensation to members of the national guard, who may be injured while performing any duty, lawfully ordered by their superior officers; and such a provision by general statute creates a moral obligation on the state to a soldier who enlists, and is afterwards injured while performing a lawfully ordered duty, and who is not at fault. (p. 354).

5. MILITIA—*Militiamen—Injuries—Statutes.*

Sec. 47, ch. 18, Code 1906, embraces the case of a member of the national guard who is injured while going to the place of annual encampment, and who is not at fault when injured. (p. 353).

6. CONSTITUTIONAL LAW—*Appropriations—Public or Private Purposes—Power of Courts.*

Whether an appropriation is for a public, or a private, purpose is a judicial question; but if it does not clearly appear from the act of appropriation that it is for a purely private purpose, the court can not so decide. If any doubt exists as to whether it is for a public or a private purpose, the court must uphold the legislative act. (p. 359).

7. SAME—*Special or General Law—Legislative Determination.*

A fact once determined by the Legislature, and made the basis of an act, is not thereafter open to judicial investigation. (p. 359).

8. STATUTES—*Special or General Act—Legislative Determination.*

Whether a special act or a general law is proper, is generally a question for legislative determination; and the court will not

hold a special act void, as contravening sec. 39, Art. VI. of the State Constitution, unless it clearly appears that a general law would have accomplished the legislative purpose as well. (p. 360).

Petition for *mandamus* by A. W. Woodall to compel the issue of an Auditor's warrant under a legislative appropriation, to which John S. Darst, State Auditor demurred.

*Writ awarded.*

*Cato & Bledsoe* for petitioner.

*William G. Conley,* Attorney General, and *Frank Lively,* Assistant Attorney General, for respondent.

WILLIAMS, JUDGE:

This is a *mandamus* proceeding to compel the auditor to issue his warrant in favor of relator upon the treasurer for $2,500 which was appropriated out of the state revenues by an act of the extraordinary session of the Legislature which convened February 23, 1907. The appropriation to him was included in the general appropriation act, entitled, "A BILL making appropriations of public money to pay general charges upon the treasury." So much of the act as relates to the appropriation made to relator reads as follows: "For A. W. Woodall, member of Co. M., 2nd Regiment West Virginia National Guard, injured while on duty going to State Encampment at Parkersburg, August 3rd, one thousand nine hundred and three, two thousand five hundred dollars."

Respondent demurred to, and answered, the alternative writ. His answer avers that the certified copy of the general appropriation bill furnished to him by the keeper of the rolls, and by the clerk of the senate, contained no item of appropriation to relator, and also that the printed acts passed by the legislature at the extraordinary session of 1907, did not contain any item of appropriation in his favor. He further avers that he does not know whether the appropriation in favor of relator was constitutionally passed or not, and calls for proof of that fact.

The legislature was convened by the governor in extraordinary session on the 23rd of February, 1907, and adjourned on the 5th of March, 1907. It appears from the journals of the two houses that the general appropriation bill was passed on the 5th day of March, 1907, and placed in the hands of the governor

on that day, and that the legislature also adjourned on that day
*sine die.* The appropriation to relator appears in the enrolled
bill as passed by the legislature. The governor disapproved this
particular item on the 9th day of March, 1907, which was with-
in five days after the bill came to his hands, but after the legis-
lature had adjourned. Until recently it was generally supposed
that the governor had the power, and the constitutional right, to
veto any particular item in the general appropriation bill, with-
in five days after the act was placed in his hands, notwithstand-
ing the legislature may have adjourned before his right of veto
could be exercised. Such had been the practice of the governor
and of his predecessors in office, and such was their interpre-
tation of the constitutional right of the executive. The keeper of
the rolls, supposing the governor's disapproval of the appropri-
ation had the effect to defeat it, did not copy it into the certified
copy of the appropriations bill which he furnished to the auditor,
nor was it published as a part of the printed acts passed at that
session of the legislature. But we have recently decided in *May
v. Topping,* 65 W. Va. 656, that the governor is prohibited by
the constitution from vetoing a general appropriations bill, or
any item in it, unless he communicate his reasons therefor to the
legislature before its adjournment. The effect of this holding
is, that the governor must veto an appropriation bill or any par-
ticular item of it, before the legislature adjourns, or not at all.
The legislature may by adjourning immediately after the pas-
sage of an appropriation act, defeat the governor's right of veto.
Still it must not be supposed that it would thus purposely defeat
the right, which is to be exercised in a particular manner, con-
ferred by the Constitution upon a co-ordinate branch of the gov-
ernment. According to our holding in that case, which we still
adhere to as correctly interpreting the Constitution in relation to
the governor's right of veto of an appropriation bill, the veto in
the present case was ineffectual to defeat the passage of the spe-
cial appropriation in favor of relator.

It is urged by counsel for respondent that the appropriation is
unconstitutional for the reason that it is made for a purely pri-
vate purpose; that it was a mere gift to Woodall, and that the
Legislature was without constitutional right or power to make
private donations out of the public treasury. This is unquestion-

ably true, if the public had no interest in the appropriation. The law is too well settled to require an extended argument to the effect that the Legislature can levy taxes and appropriate public revenues, only for public purposes. The power to tax is conferred upon the legislature to be used only for the public. It can not be exercised solely in the interest of a private person or enterprise, notwithstanding there may be no express inhibition on the legislature. 1 Cooley on Con. Lim. 181-185. The right of the legislature to appropriate the public funds is no greater than its right to tax. 1 Cooley on Con. Lim. 184. The limitation upon the legislature requiring it to apply public revenues to public purposes only, is to be implied from the very nature of free government.

In the case of *Loan Ass'n.* v. *Topeka,* 20 Wall. 655, Justice Miller, speaking for the court on the subject of the rights of the individual to be exempt from taxation except it be for a public purpose, at page 663 says: "There is no such thing in the theory of our governments, State and National, as unlimited power in any of their branches. The executive, the legislative, and the judicial departments are all of limited and defined powers."

"There are limitations of such powers which arise out of the essential nature of all free governments; implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to that name."

The following cases are all in point, and all hold that the legislature is without power to levy taxes or make appropriations of public moneys for a purely private purpose: *Fallbrook Ir. Dist.* v. *Bradley,* 164 U. S. 112; *Strickley* v. *Mining Co.,* 200 U. S. 527; *Coates* v. *Campbell,* 37 Minn. 498; *Matter of Tuthill,* 163 N. Y. 133; *Dodge* v. *Mission Township,* 107 Fed. Rep. 827; *Sharpless* v. *Mayor, Phil.,* 21 Pa. 147; and 27 A. & E. E. L. 626, and numerous cases cited in note.

"The legislature is to make laws for the public good, and not for the benefit of individuals. It has control of the public moneys, and should provide for disbursing them only for public purposes." 1 Cooley, Con. Lim., 184.

But we think the appropriation to relator was made in discharge of a moral obligation upon the state to compensate him for the injury which he received while on duty in going to the

state encampment, and growing out of a previous act of the legislature, to-wit, sec. 47 of the military code, wherein the legislature declared that it would make provision for any member of the national guard "who shall without fault or neglect on his part be wounded or disabled while performing any lawfully ordered duty." And, having thus previously held out an inducement to relator to enter the military service, it became the moral duty of the state to make provision for him after his injury, if he was not at fault.

There is no doubt of the right of a state to provide for the payment of bounties or pensions to those who enter the military service and are disabled, and to the families of those who are killed. Such provisions operate to encourage enlistment—a matter in which the public is interested. The defense of the state and the suppression of riots, mob violence and insurrection are matters of public concern. An organized militia is, therefore, essential; and, if not composed of volunteers, it must be made up by drafting men into service; and whatever encourages volunteers to enlist will tend to relieve from the necessity of drafting, and is a relief to the public. For that reason a statute providing for bounties to volunteers, is an act in the interest of the public welfare. 1 Cooley on Taxation 217. During the civil war the legislatures of a number of the northern states passed acts authorizing towns to raise funds, by taxation, for the payment of bounties to volunteers. If those acts encouraged enlistment and thus relieved the town from an impending draft, they were held to be constitutional, as being for a public purpose. *Speer* v. *School District,* 50 Pa. St. 150; *Taylor* v. *Thompson,* 42 Ill. 9; *Lowell* v. *Oliver,* 8 Allen (Mass.) 247; *Crowell* v. *Hopkins,* 49 N. H. 1; *Miller* v. *Gradey,* 13 Mich. 540.

But when the act authorized the raising of a fund by taxation to pay bounties to soldiers who had previously volunteered, or to repay money to persons who had hired substitutes, they were held by the courts to be unconstitutional, on the ground that they amounted to an appropriation of public funds to a purpose that was purely private; and that the legislature was without power to make private donations out of the public funds. *Freeland* v *Hastings,* 10 Allen (Mass.) 570; *Perkins* v. *Inhabitants of Milford,* 59 Me. 315; *Kelly* v. *Marshall,* 69 Pa. St. 319; *Busk* v.

*Board of .Supervisors,* 159 N. Y. 212; *Mead* v. *Town of Acton,* 139 Mass. 341, 1 N. E. 413.

The purpose of the United States Government to pension soldiers and sailors who entered the United States service, and who were disabled in the war then existing between this country and Great Britain, was declared by resolution of Congress, passed August 26, 1776. The policy of the government was thus declared, and the public was served by the inducement thus held out to persons to enlist in the army and navy. And by act of Congress, passed April 10, 1806, a general provision was made for the payment of pensions to soldiers and seamen, disabled in the war of the revolution; and it has been the uniform policy of the general government, ever since that time, to pension her disabled soldiers and seamen. In consequence of this wise and generous policy, it is easy for the general government to obtain volunteers when their services are needed in the country's defense.

For a number of years past it has been the declared policy of this state to make provision for any member of the national guard who is incapacitated while on duty. Sec. 47, ch. 18, Code 1906. The following language in that section, viz.: "or who shall without fault or neglect on his part be wounded or disabled while performing any lawfully ordered duty," we think, is sufficiently comprehensive to include the case of petitioner, who, as it appears from the language of the appropriation itself, was injured while on duty going to the state encampment at Parkersburg. The act includes every injury which incapacitates the soldier from pursuing his usual business, and which he receives while performing any lawfully ordered duty; and relator was certainly performing such duty in going to the place of encampment.

The provision of the above quoted statute was an inducement, no doubt, to relator, and to every other national guardsman to enlist in the military service of the State. Relator, therefore, had a right to expect that, if he was hurt while performing his duty, he would be compensated out of the public treasury; and having entered the service and received his injury after the enactment of that statute, there was a moral duty resting upon the state to make provision for him.

The legislature has a right to appropriate the public funds in

discharge of the state's duty, whether the duty be legal or only moral. And the discharge of such an obligation is always regarded as a legitimate exercise of governmental power. That a private person may receive the benefit of an appropriation made in discharge of a public moral duty, does not constitute the act of appropriation a private one. *United States* v. *Realty Co., 163 U. S. 427, 48* Law ed. *215*; *State ex rel. McGurdy* v. *Tappan, 29* Wis. *664*; *Freeland* v. *Hastings, supra.* In *Trustees of Exempt Firemen's Fund* v. *Roome, 93* N. Y. *313*, a legislative act was held to be constitutional, which required the agents of insurance companies, not incorporated under the laws of New York to pay annually to the treasurer of the Exempt Firemen's benevolent fund of the city of New York, a percentage upon the gross premiums received by such companies for insurance upon property in that city. The court, in its opinion at page *327*, says: "When the state takes from the public treasury a sum of money and gives it to a corporate body for the relief of deserving beneficiaries it does one of two things. It either bestows a charity, or recognizes and discharges an obligation due from it to the recipients. The former it cannot do except in specified cases. The latter it may always do, for the constitutional provision was not intended and should not be construed to make impossible the performance of an honorable obligation founded upon a public service, invited by the State, adopted as its agency for doing its work, and induced by exemptions and rewards which good faith and justice require should last so long as the occasion demands." ✓

In making appropriations of public moneys, the legislature is not confined within the strict limits of what, in cases between individuals, would be considered a legal obligation, "but it may recognize moral or equitable obligations, such as a just man would be likely to recognize in his own affairs, whether by law required to do so or not." 1 Cooley on Taxation *209*.

The appropriation was made to relator in discharge of a moral obligation resting upon the state, and, therefore, it must be regarded as being for a public purpose, and within the constitutional powers of the legislature.

It is urged that respondent, being a ministerial officer, had no right to question the constitutionality of the appropriation. On this point there is some conflict of decisions; but the weight

of authority is in favor of the right of the auditor to do so. In *Pell* v. *Newark,* 40 N. J. L. 71, it was held that, on application for a *mandamus* against the common council, they could question the constitutionality of an act which legislated them out of office. In *Denman* v. *Broderick,* 111 Cal. 96, it was held that: "The act under which the election commissioners of San Francisco were appointed, as provided for in section 1075 of the Political Code, being unconstitutional and void, the auditor of the city and county of San Francisco was not authorized to draw a warrant for the salary of such election commissioners, and *mandamus* will not lie to compel him to draw such warrant."

*Commonwealth* v. *Mathues,* 210 Pa. St. 372, was an application for a *mandamus* to compel the treasurer to execute his warrant in favor of certain judges for their salaries; and the court held that the treasurer had the right to question the constitutionality of the act, providing for an increase of salary. That is a recent decision, and it is supported by a well reasoned opinion, in which many cases are cited, pro and con. The court, on page 390, says: "Although we do not decide that all ministerial officers of the state government have a right to refuse to act under a law because they conceive it to be unconstitutional, and thus constitute themselves tribunals to pass upon the validity of acts of the legislature generally, we do hold in this particular case that the state treasurer, being a high constitutional officer of the commonwealth, intrusted with the funds of the state, under the law, has the right to raise by his pleadings, the question of the constitutionality of the act of April 14, 1903, fixing the salaries of the judges of the commonwealth."

In *Huntington* v. *Worthen,* 120 U. S. 97, discussing this question, Justice Field uses this language: "It may not be a wise thing, as a rule, for subordinate executive or ministerial officers to undertake to pass upon the constitutionality of legislation prescribing their duties, and to disregard it if in their judgment it is invalid. This may be a hazardous proceeding to themselves and productive of great inconvenience to the public; but still the determination of the judicial tribunals can alone settle the legality of their action. An unconstitutional act is not a law; it binds no one, it protects no one." See also *Norton* v. *Shelby Co.,* 118 U. S. 425.

The supreme court of appeals of Kentucky, in *Norman, Au-*

*ditor* v. *The Kentucky Board &c.,* 93 Ky. 537, held that: "The state auditor has the right, when called upon to issue his warrant upon the Treasury for money appropriated by act of the legislature, to question the validity of the act making the appropriation."

It may be an unwise policy to permit a subordinate ministerial officer to disregard a statute, because he may think it is not constitutional, in violation of the directions of his superior officer, as that would tend to bring about confusion in the administration of the law; but we see no reason why the auditor, who is at the head of one of the important branches of the executive department and charged with the duty of protecting the state's funds, should be denied the right to do so.

The right of the courts to inquire into an appropriation of the public funds, to determine whether it is for a public or a private purpose, is recognized. Such a question presents a fact to be determined, and is, therefore, a matter proper for judicial ascertainment. But judicial inquiry can extend no further' than is necessary to determine the fact. The court has no right to question the wisdom or the governmental policy involved in the act; those matters pertain exclusively to the legislative branch of government. Moreover, if there is any doubt in the mind of the court, as to whether the purpose is public or private, it must resolve the doubt in favor of the constitutionality of the act. But if it clearly appears from the act itself, that the tax levied, or the appropriation made, is for a purely private purpose, it necessarily follows that it is void, as being beyond the legitimate scope of legislative power to make it, and the court can so declare. The legislature can not, by its mere fiat, make an appropriation or a tax a public one, which in its nature is private; and whether it is public or private depends upon the use to which the appropriation is to be applied, and the legislative purpose in making it.

"The decision of the question whether a tax or a public debt is for a public or private purpose is not a legislative, but a judicial, function. A legislature cannot make a private purpose a public purpose, or draw to itself or create the power to authorize a tax or a debt for such a purpose, by its mere fiat." *Dodge* v. *Mission Township,* 107 Fed. 827; *Fallbrook Ir. Dist.* v. *Brad-*

*ley,* 164 U. S. 112; *Allen* v. *Inhabitants of Jay,* 60 Me. 124; *Tyler* v. *Beacher,* 44 Vt. 648; *In re &c. Mfg. Co.,* 96 N. Y. 42; *Weismer* v. *Village of Douglass,* 64 N. Y. 91; *Coates* v. *Campbell,* 37 Minn. 498; *Stevenson* v. *Colgan,* 91 Cal. 649; *Loan Ass'n.* v. *Topeka,* 20 Wall. 655; 1 Cooley on Taxation 183.

The return sets up the fact that relator was not in line of duty, but was acting in disobedience to the command of the officer, when he received his injury. This is a matter which the legislature must have inquired into before making the appropriation, and it is foreclosed to us. The ascertainment of a fact by the legislature, as the basis for an act passed by it, is not thereafter open to judicial investigation. *Lusher* v. *Scites,* 4 W. Va. 11; *Stephenson* v. *Colgan, Comptroller,* 14 L. R. A. 459.

It is urged that the appropriation to respondent is void because it is made by a special act, when it could have been provided for by general law and, therefore, contravenes section 39 of article VI of the Constitution which, in part, reads as follows: "and in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case, nor in any other case in which the courts have jurisdiction, and are competent to give the relief asked for."

We do not think it void for that reason. From 36 Cyc. 991 we quote: "It is the general doctrine that the legislature is the sole judge whether a provision by a general law is possible under a provision in the constitution to the effect that no special law shall be enacted, in all cases where a general law can be made applicable." See also, in support of the text, *U. S. Bank* v. *Guthrie,* 173 U. S. 528; *Hager* v. *Children's Home Society,* 119 Ky. 235.

We must assume that the legislature considered, whether or not its purpose in making the appropriation to relator could best be accomplished by a general, or by a special, act, and determined in favor of the latter; and, having so determined, the court is not at liberty to say that it abused its discretion, unless it clearly appears from the character of the appropriation that a general law would have answered the purpose as well. This is not clear; there are many matters that might very justly and properly be considered by the legislature in determining the merits of claims of the same general nature as relator's, which could not well be embodied in a general law. For instance the needs of the claim-

ants and those dependent upon them might very properly influence the legislature in determining the amount it would apply to discharge an obligation purely moral.   The most that we can say is, that it is doubtful if a general law would be as proper to accomplish the purpose which the legislature had in view as the special appropriation and we must resolve the doubt in favor of the validity of the act.   Our judgment is to award the writ.

ROBINSON, JUDGE, *(concurring):*

The Auditor has a personal interest entitling him to raise the question of constitutionality.   Whether that question could be raised on other considerations, it is now wholly unnecessary to inquire.

There is no constitutional inhibition against such appropriation as the one in question is expressed to be on its face.   With the wisdom or policy of the appropriation the courts have nothing whatever to do.   It may be that as legislators we would not vote for it.   But the legislature must be presumed to have acted in good faith for the public good and upon sound reasons.   Every presumption favors the validity of the act.   If it is of doubtful legality these presumptions save it.   The legislative department presumably acts for the public good or in recognition of obligations reasonably due from the public, when the fact does not palpably appear that it acts beyond the constitutional limits which alone control it.   A most eminent judge and author says: "The independence of the legislature is an axiom in government; and to be independent, it must act in its own good time, on its own judgment, influenced by its own reasons, restrained only as the people may have seen fit to restrain the grant of legislative power in making it.   The legislature must, consequently, determine for itself, in every instance, whether a particular purpose is or is not one which so far concerns the public as to render taxation admissible." 1 Cooley on Taxation (3rd ed., 182.   Judge Cooley also says:  "It must always be conceded that the proper authority to determine what should and what should not constitute a public burden is the legislative department of the State. * * * * * * * And in determining this question the legislature cannot be held to any narrow or technical rule.   Not only are certain expenditures absolutely essential to the continued existence of the government and the performance of its ordinary functions, but as a matter of policy it may sometimes

be proper and wise to assume other burdens which rest entirely on considerations of honor, gratitude, or charity. The officers of government must be paid, the laws printed, roads constructed, and public buildings erected; but with a view to the general well-being of society, it may also be important that the children of the state should be educated, the poor kept from starvation, losses in the public service indemnified, and incentives held out to faithful and fearless discharge of duty in the future, by the payment of pensions to those who have been faithful public servants in the past. There will therefore be necessary expenditures, and expenditures which rest upon considerations of policy only, and, in regard to the one as much as to the other the decision of that department to which alone questions of state policy are addressed must be accepted as conclusive." Cooley on Constitutional Limitations (6th ed.), 599.

The people, through their representatives in legislative assembly, are their own watch dogs of the treasury. The courts have no power to constitute themselves as such. The only power they have is to observe that the constitution plainly inhibits an expenditure and so to declare. When no such inhibition appears, the people are entitled to expend the public money on matters of public consideration, like sacrificing military service, just as they please. Miltary charges, military bounties and claims, are certainly proper subjects for which taxes can be lawfully raised and expended. Long have they been so considered. True, it will be a glad day when peace, quietude, and universal obedience to the laws shall make them wholly unnecessary. But that day is not here, and if the legislative representatives of the people find that a soldier has given a leg to the public military service and feel that there is a beneficial, moral or patriotic duty resting on the public to pay for the same, they may do so. The wisdom and propriety of such action is wholly with them. Nor can the courts examine into the facts upon which they acted and reverse their judgment. They are entitled to the credit of cautious and valid action as well as are the courts. If representatives of the people become extravagant or act unwisely the remedy is at the elections. It does not lie with us, so long as they expend money as in this instance presumably on public consideration and clearly within constitutional limitations. "The exercise of the taxing power by the legislature must become wanton

and unjust—be so grossly perverted as to lose the character of a legislative function—before the judiciary will feel themselves entitled to interpose on constitutional grounds.   To arrest the legislation of a free people, especially in reference to burthens self-imposed for the common good is to restrain the popular sovereignty, and should have clear warrant in the letter of the fundamental law." *Schenley* v. *Allegheny*, 25 Pa. St. 128; 1 Cooley on Taxation, (3rd ed.), 186.

The writ should be awarded.   The people are supreme, even though at times we may think them unwise.

*Writ Awarded.*