ARPS ET AL., PLAINTIFFS, *v.* STATE HIGHWAY COMMIS-
SION ET AL., DEFENDANTS.

No. 6,877.)

(Submitted June 2, 1931.   Decided June 11, 1931.)

[300 Pac. 549.]

*Messrs. Walsh & Nagle,* for Plaintiffs, submitted a brief; *Mr. Raymond T. Nagle* argued the cause orally.

*Mr. Howard W. Toole* and *Mr. E. G. Toomey,* for Defendants, submitted a brief, and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. C. N. Davidson,* Assistant Attorney General, for Defendants, submitted a brief.

*Mr. Jess H. Stevens, Amicus Curiae,* submitted a brief.

Opinion: PER CURIAM.

This action, by reason of its public importance, was begun by plaintiffs in this court to secure an injunction restraining

the defendants from issuing or selling state highway treasury anticipation debentures which are authorized by Chapter 95 of the Laws of 1931, generally known as the State Highway Treasury Anticipation Debenture Act, which we shall refer to hereafter as Chapter 95. Upon the filing of the complaint an order to show cause was issued, and upon the return day the defendants filed a motion to quash and also an answer.

1. It is provided in the Act that for the purpose of anticipating the revenue to accrue in the state highway fund for the purpose of assuring the ability of the state to secure any funds or moneys allocated and made available to it by the Acts of Congress in reference to the construction, betterment and maintenance of highways, and to provide additional working funds for the state highway commission, a loan or series of loans for the use and benefit and in the name of the state of Montana in the total principal sum of $6,000,000, and not exceeding $1,500,000 in any one year, is authorized. Loans are to be negotiated by the issuance and sale of a series of debentures. The source of the money wherewith to pay the same is a license tax imposed upon the sales of gasoline made by a distributor or dealer at the rate of five cents per gallon, beginning April 1, 1931, and ending March 31, 1941, after which the tax shall be three cents. It is unnecessary to set forth particularly the terms of the Act, as a discussion of the attacks made against it will disclose its salient features. However, it is necessary to outline briefly the history of the Acts which generally are referred to as those imposing a gasoline tax.

2. With the advent of the motor-driven vehicles and the consequent increase of travel and transportation by means other than rail, the demands for better roads and more of them became imperative. This demand was recognized by the Congress in the passage of the Federal Highway Act (39 U. S. Stat. 355, amended 42 U. S. Stat. 212 [23 U. S. C. A., secs. 1–25]) in July, 1916, providing for federal aid to the several states under designated conditions.

In an attempt to meet the requirements of the federal Act, our legislature in 1917 created the state highway commission,

defined its powers and authority, and diverted to its use seventy-five per cent. of the receipts from our motor vehicle license tax (Chap. 170, Laws 1917), and later diverted all of this tax to the highway fund (Chap. 207, Laws 1921).

These Acts were superseded by the provisions of Chapter 10, Laws of the Extraordinary Session of 1921, providing a comprehensive plan for the construction and maintenance of highways, trunk, arterial, lateral and connecting, throughout the state, under the supervision of the state highway commission, assenting to the Federal Highway Act and directing the state highway commission to enter into all contracts and agreements for highway purposes with the United States.

Pursuant to this legislation and with the approval of the secretary of agriculture, certain routes and highways have become a part of the Federal Highway System, and these, when completed, will afford a state-wide system of standardized trunk highways, east and west, north and south, with connecting lines covering the entire state. The system, when completed, will comprise nearly 5,000 miles, but the work is not half completed owing to the fact that, through lack of sufficient funds, we are approximately ten years behind the program.

In 1921, under the authority of the final clause of section 1, Article XII, of the Constitution, the legislature laid an excise tax of one cent per gallon on distributors and dealers in gasoline, but no part of the proceeds of this tax was allocated to the state highway fund (Chap. 156, Laws 1921, which became sections 2381 to 2396, inclusive, Revised Codes 1921).

In 1923 this license tax was raised to two cents per gallon and provision was made for the payment of twenty per cent. of the receipts into the highway fund (Chap. 150, Laws 1923), but in 1925 this percentage was cut to fifteen per cent. (Chap. 186, Laws 1925). The situation was further complicated by the fact that certain portions of these enactments were found to be unconstitutional by decisions which are unimportant here.

Realizing that if we were to gain any advantage from the Federal Aid Act and to eventually bring our highways up to

the standard maintained in sister states, the state highway commission must be supplied with funds for the purpose of matching the federal allotments, the people of the state at the general election in 1926 voted to increase the excise tax to three cents per gallon, the entire receipts therefrom to go to the highway fund (Initiative Measure 31, p. 604, Laws 1927), and its provisions were extended and strengthened 'by defining terms used, and providing penalties for their violation (Chap. 19, Laws 1927).

After ten years of comparative inactivity due to lack of funds, our present road building program was begun in March, 1927, as a result of the enactment of the Initiative Measure and Chapter 18, Laws of 1927, redistricting the state for highway construction purposes, and prescribing the manner and place in which the moneys of the highway fund should be expended. By Chapter 92, Laws of 1929, the excise tax on distributors and dealers in gasoline was increased to five cents per gallon for the period ending March 1, 1933.

In 1930 Congress appropriated for the fiscal year ending June 30, 1931, $50,000,000, in addition to the sum of $75,000,000 theretofore appropriated for the purpose of carrying out the provisions of the Federal Highway Act, and there is available to this state during the period of 1931–1934, approximately $6,000,000, a substantial part of which will revert to the United States treasury unless matched by June 30 of this year.

From the facts and figures before us it is apparent that the excise tax of five cents per gallon would furnish ample funds for our highway program, were it not for the fact that we are approximately ten years behind and, consequently, cannot match the federal allotment available unless we can presently secure the necessary funds in addition to the current receipts from the gasoline license tax.

Faced with this situation existing in our state, showing the imminent danger of the loss for highway construction of approximately $6,000,000, our legislature, as one of its first acts in 1931, sought to meet the situation by anticipating the receipts from the excise tax over the period 1931–1934, by the

sale of debentures (Chap. 1, Laws 1931), and, by a companion measure, to extend the period of the five cent tax to conform to the debenture period (Chap. 6, Laws 1931).

The answer herein alleges that such action is particularly desirable because of world-wide economic paralysis and acute agricultural and industrial depression, because of which thousands of our citizens, many of them heads of families, are out of employment and that a continuance of our road program will furnish employment for at least 3,000 men; and it is further set forth that, because of the condition of our roads, this state is being discriminated against by the outside traveling public.

However, Chapter 1, above, was declared unconstitutional as creating a debt or liability in excess of $100,000, without submitting the law to a vote of the people. (*State ex rel. Diederichs* v. *State Highway Commission*, 89 Mont. 205, 296 Pac. 1033, 1036.) The opinion was promulgated on February 21, 1931, but three days prior to the expiration of the time within which bills for the appropriation of money, except for the expenses of the government, could be introduced without the unanimous consent of the house in which it was sought to introduce them. (Sec. 21, Art. V, Constitution.) Forthwith House Bill 450 was drafted and introduced in the house, clearly for the sole purpose of meeting the constitutional defect in Chapter 1, Laws of 1931, by submitting to the people the law anticipating the receipts from the five cents excise tax over the period ending March 1, 1941. This Act incorporated the provisions of Chapters 1 and 6, Laws of 1931, and provided the machinery for its submission at an election called for May 5, 1931. It was duly passed in both houses and transmitted to the governor, who approved it on March 3, 1931.

At the election held on May 5, approximately two out of every three electors voting, voted in favor of the law, and, on a canvass of the returns in conformity with the provisions of the Act, it was declared approved by the people and thereafter duly declared in full force and effect by the proclamation of the governor, in conformity with the law.

3. The first attack upon the Act is that it was not submitted to the people at a general election, as required by section 2 of Article XIII of the state Constitution. Section 11 of the Act provides: "Pursuant to Section 2 of Article XIII of the Constitution of Montana, this law shall be, and it hereby is submitted to the people for their approval or disapproval, at the general election ordered." Section 12 provides: "There is hereby called a general statewide election to be held in each precinct of every county in this State on Tuesday, the 5th day of May, 1931, and at such election this law shall be submitted to the qualified voters for their approval or disapproval, and authorization of the liability herein created, by a majority vote."

Section 2 of Article XIII of the Constitution reads as follows: "The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election."

In the *Diederichs Case*, supra, we said on this very point: "The last part of section 2, Article XIII, requires that such a law be submitted to the people 'at a general election.' This provision was a part of the Constitution as originally adopted and was framed at a time when the referendum was comparatively unknown. We think, considering the subject-matter of the section, the term 'general election' does not mean necessarily the general biennial election. The Constitution does not

say so. Constitutions ordinarily do not provide the machinery for carrying out their commands; they simply declare what may (or must) and what may (or must) not, be done. We think the 'general election' named means a state-wide election at which all the people entitled to vote may vote upon a question affecting them as a whole. Should a great calamity occur requiring the immediate expenditure of funds over $100,000 for the public welfare and safety, can one believe that the legislative assembly, being convened to act in the emergency, cannot fix an election prior to the biennial general election? Common sense denies the supposition.''

Counsel for plaintiffs says this expression on our part was *dictum.* Conceding that it was, after a further careful examination of the section to ascertain its full purpose and meaning, and comparing it with other sections of the Constitution, we are satisfied that the interpretation laid down in the *Diederichs Case* is correct.

"The key to the opening of every law is the reason and spirit of the law," said Lord Coke. (*Brett* v. *Brett,* 3 Add. Ecc. 210, 162 Eng. Rep., full reprint, 456.)

As we have observed hitherto, the Constitution must receive a broad and liberal interpretation consistent with the purpose of the framers and the people in adopting it, that it may serve the needs of a growing state; "the proper interpretation of any constitutional provision requires us to remember that it is a part of the organic law—organic not only in the sense that it is fundamental, but also in the sense that it is a living thing designed to meet the needs of a progressive society, amid all the detail changes to which a progressive society is subject." (*State ex rel. Fenner* v. *Keating,* 53 Mont. 371, 163 Pac. 1156, 1158.)

Why does the Constitution provide that the law shall be submitted to the people at *a* general election, rather than *the* general election, or, let us say, the regular biennial election? The answer is, obviously, because the framers contemplated that it might be necessary or convenient to hold a general election at some other time than at the regular biennial election and

for a purpose, or purposes, other than those which are ordinarily voted upon at the biennial election. Some authorities say ''a general election is one provided for by law for the election of officers throughout the state.'' But we find that in section 2 of Article IX, which relates to rights of suffrage and qualifications to hold office, the following language: ''At all general elections and for all officers that now are, or hereafter may be, elected by the people and upon all questions which may be submitted to the vote of the people,'' and in section 11 of the same Article: ''Any person qualified to vote at general elections and for state officers in this state, shall be eligible to any office therein except as otherwise provided in this constitution.'' It thus appears clearly that state officers are not necessarily voted upon at *all* general elections, for general elections may be held for other purposes than the election of officers.

It seems significant that when the legislative assembly proposed and the people adopted the amendment to section 1 of Article V of the Constitution relating to legislative powers, that portion of the amendment relating to the referendum provided that a referendum must be submitted to the people ''at the biennial regular general election, except when the legislative assembly, by a majority vote, shall order a special election.'' If the framers of this Article had not been of the opinion that the referendum contemplated by section 2 of Article XIII may be voted for at a general election rather than the biennial election, why did they use the terms ''biennial regular general election,'' when referring to the referenda especially contemplated in the amendment?

Other provisions of the Constitution are more or less applicable to this discussion and add strength to our conclusion that the mandate of section 2 of Article XIII does not compel the election therein provided for to be held at *the* general election, which, as ordinarily understood, refers to the election whereat the people by vote select their officers. (See *State ex rel. Rowe* v. *Kehoe*, 49 Mont. 582, 144 Pac. 162.)

It is noteworthy that section 2 of Article XIII does not require any vote in case of war, to repel invasion, or sup-

press insurrection. These calamities are so great as to brook no delay. No matter how expeditiously an election is conducted, delay necessarily will ensue. The framers of the section, therefore, had in mind some such calamity as we had in mind in the *Diederichs Case*. As illustrative: Suppose fire should destroy all the buildings of the state insane asylum immediately after the adjournment of the legislative assembly, and the governor should immediately convene that body for the purpose of enacting legislation to provide for our unfortunate wards, and to rebuild, which would cost more than $100,000. Plainly enough, section 2 of Article XIII contemplates, *inter alia*, an emergency. Is it possible that the people of Montana could not remedy the situation until after a vote cast at the succeeding biennial election? A number of other contingencies of like character come readily to the mind. Statesmanship as well as common sense denies the supposition.

There is much contrariety in the decisions defining "general" and "special" elections. We are not disposed to decide this case upon definitions found in numerous decisions arising upon fact conditions differing more or less widely from those in the case at bar. We choose to base our conclusion upon what we deem to be the clear intention of the framers, in proposing for adoption, and of the people in adopting, section 2 of Article XIII, in the light of the reason and the spirit of the law.

We agree with the supreme court of Oregon that a general election "is one that regularly recurs in each election precinct of the state on a day designated by law for the selection of officers, *or* is held in such entire territory pursuant to an enactment specifying a single day for the ratification or rejection of one or more measures submitted to the people by the legislative assembly, and not for the election of any officer, * * * for the election having been simultaneously held in every voting precinct of the state conclusively establishes the fact that the election was 'general,' and not 'special,' which latter term, though not involved herein, would appear to mean an election held in only a subdivision or a part of the state." (*Bethune* v. *Funk*, 85 Or. 246, 166 Pac. 931, 932; and see

*Norton* v. *Coos County,* 113 Or. 618, 233 Pac. 864; *Territory* v. *Ricordati,* 18 N. M. 10, 132 Pac. 1139; *Mackin* v. *State,* 62 Md. 244; *Downs* v. *State,* 78 Md. 128, 26 Atl. 1005.)

While the framers of the Constitution did not always use terms in their strict sense, technical sense (*Hilger* v. *Moore,* 56 Mont. 146, 182 Pac. 477), they were careful in the phraseology employed. Apt words were chosen to express their meaning. Now, if they had intended that the elections contemplated by section 2 of Article XIII should be held at the regular biennial election, it would have been easy to say so.

4. The next serious argument is that conceding the election ▮▮▮ held May 5, 1931, was a general election, still it was submitted by special Act which is directly prohibited by section 26 of Article V of the Constitution. This Article specifically provides that "the legislative assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * the opening or conducting of any election or designating the place of voting. * * * In all other cases where a general law can be made applicable, no special law shall be enacted."

Clearly the Act in question is not a local law. Is it a special statute? In *State ex rel. Redman* v. *Meyers,* 65 Mont. 124, 210 Pac. 1064, 1065, this court said: "A special statute is one which relates to particular persons or things of a class (*In re Church,* 92 N. Y. 1) or one made for individual cases and for less than a class (*Guthrie Daily Leader* v. *Cameron,* 3 Okl. 677, 41 Pac. 635), or one which relates and applies to particular members of a class, either particularized by the express terms of the Act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable (*State* v. *Cooley,* 56 Minn. 540, 58 N. W. 150). The test of a special law is the appropriateness of its provisions and the objects that it excludes. It is not, therefore, what a law includes, but what it excludes, that determines whether it is special. (*Budd* v. *Hancock,* 66 N. J. L. 133, 48 Atl. 1023)." (And see *Trumper* v. *School Dist.,* 55 Mont. 90, 173 Pac. 946.)

As has been shown in this opinion, the legislative assembly had determined to submit to the people an Act providing for funds with which to match funds supplied by the United States for building highways and it was necessary to do so before the thirtieth day of June of this year. It was deemed necessary to shorten the time for registration and to give notice of the time within which those not registered but desiring to register might do so, to provide for sending copies of the Act to the voters, and to shorten the time for the return and canvass of the votes. None of these acts had anything whatsoever to do with opening or conducting the election. With respect to this point the decision of the supreme court of Colorado, in *People* v. *Earl,* 42 Colo. 238, 94 Pac. 294, 302, is not only directly in point, but is especially forceful for the reason that we borrowed section 26 of Article V almost bodily from Colorado. In that case the supreme court was confronted with a proceeding designed to test the right of certain persons to hold offices which they were assuming to hold under an election which was attacked as a special or local one. It was contended that the Registration Acts which were made applicable to the election were in contravention of subdivisions 15 and 24 of section 25 of Article V of the Colorado Constitution, identical with ours. The court said: "The Registration Acts are not within the inhibition of the fifteenth subdivision above quoted, for the reason that they do not in any manner attempt to control the opening or conducting of elections, nor do they in any manner attempt to designate the place of election. * * * It is said that the Acts under consideration are special or class legislation; that a general Act applicable to the whole state should have been enacted. * * * The position of relator upon this phase of the case cannot be sustained." (And see *People* v. *Emmerson,* 323 Ill. 561, 154 N. E. 474.)

The object of the prohibition of special or local laws is to prevent a diversity of laws relating to the same subject. (1 Lewis' Sutherland on Statutory Construction, 2d ed., sec. 199; *People* v. *Wilcox,* 237 Ill. 421, 86 N. E. 672.) A law is not local or special in a constitutional sense that operates in

the same manner upon all persons in like circumstances. "General laws are those which relate to or bind all within the jurisdiction of the law-making power, and if a law is general and operates uniformly and equally upon all brought within the relation and circumstances for which it provides it is not a local or special law in the constitutional sense." (*People* v. *Borgeson*, 335 Ill. 136, 166 N. E. 451; *State ex rel. Garvey* v. *Buckner*, 308 Mo. 390, 272 S. W. 940; note to *State* v. *Ellet*, 21 Am. St. Rep. 772.)

By the terms of Chapter 95, except for the special provisions referred to, the election was to be carried out as prescribed by the general elections laws of the state. It is not alleged that there was any suspicion of fraud in the election, nor that anyone entitled to vote was deprived in any manner of that privilege, nor that the election was not fair in all respects, nor that the returns were not made properly, and the canvass correctly made. Could the general election law have been made applicable? Even if the law were special this is a question, broadly speaking, for the legislative assembly alone. (*Weston* v. *Ryan*, 70 Neb. 211, 6 Ann. Cas. 922, 97 N. W. 347; *Woodall* v. *Darst*, 71 W. Va. 350, Ann. Cas. 1914B, 1278, 44 L. R. A. (n. s.) 83, 77 S. E. 264, 80 S. E. 367; *People* v. *Emmerson*, supra; *School District* v. *School District*, 135 Okl. 270, 276 Pac. 186. Compare *State ex rel. Ford* v. *Schofield*, 53 Mont. 502, 165 Pac. 594.)

5. It is contended by plaintiffs that Chapter 95 creates a tax equal to five cents per gallon on the sale of gasoline in addition to all existing taxes, thereby making an aggregate tax equal to ten cents per gallon on gasoline sold and used in the state; that such a tax is confiscatory, and hence, Chapter 95 is unconstitutional. Defendants assert that under existing laws but one license tax of five cents per gallon on the sale of gasoline is provided for, and that therefore plaintiffs' contention is without merit.

As noted from the above history of the legislation designed to raise revenue to match the appropriation of Congress, when the legislature passed Chapter 1 of the Laws of 1931, it at

the same time passed Chapter 6 and made reference to it in Chapter 1 as the source of the revenue from which to pay the proposed debentures. When those Acts were passed, the legislature evinced in unmistakable terms an intention to repeal all prior laws and to make the tax five cents per gallon until 1941, and three cents thereafter. Chapter 6 expressly amends all prior Acts on the subject and contains a clause expressly repealing all prior Acts in conflict therewith.

Under the mistaken belief that Chapter 1 did not create a debt or liability within the meaning of section 2, Article XIII, of our Constitution, the legislature, when it passed Chapters 1 and 6, deemed it unnecessary that the scheme have the approval of the people. When this court held in the *Diederichs Case* that the legislative scheme embraced in Chapters 1 and 6 did create a liability requiring the assent of the people, the legislature, in seeking approval of the people, was confronted with the necessity, made plain by section 2 of Article XIII, of embracing in the law creating the debt or liability, provisions for levying a sufficient tax to meet the debt and interest within the time limited for their payment. To meet this situation, and still proceeding with the same purpose and plan inaugurated by Chapters 1 and 6, the legislature simply merged into Chapter 95 the substance of Chapters 1 and 6 in substantially the same language in order to meet the requirements of section 2, Article XIII, as interpreted by this court in the *Diederichs Case.*

Mindful of the possibility that Chapter 95 might not receive the approval of the people, and anticipating that if it did not, the claim would be made that there would then be no laws in effect imposing a license tax on the sale of gasoline, the legislature inserted in Chapter 95, section 10, reading as follows: "It is hereby provided that if this Act shall fail to receive the approval of the people at the general election herein provided for, nothing herein contained shall operate to repeal or amend any of the laws of the State of Montana relating to the excise taxes on gasoline or motor fuels."

We think it is plain from this section, in view of the history of this legislation and the purpose to be accomplished by it,

that it was the intention of the legislature that if Chapter 95 did receive the approval of the people it would operate to repeal all other laws relating to the excise tax on gasoline and motor fuels. This intention is also manifested by the fact that Chapter 95 does not limit the tax to the necessary revenue to discharge the debt or liability created by it, but undertakes to embrace all of the provisions previously incorporated in Chapter 6. It specifically provides what the tax rate shall be after 1941 as well as before, and thus, being the later enactment it entirely supersedes and repeals all prior Acts relating to the tax rate.

Plaintiffs contend that section 4 of the Act indicates that the legislature intended that existing laws should be unaffected by Chapter 95. That section, in part, reads: "The issue and sale of said debentures shall constitute an irrevocable contract between the State of Montana and the owner of any of said debentures that the excise or license tax on gasoline or motor fuels or dealers or distributors therein, as provided in this Act, or in any of the other laws of the State of Montana, shall not be reduced so long as any of said debentures remain outstanding and unpaid." The clause "or in any of the other laws of the state of Montana" evidently was inserted in this section for the reason that resort must be made to other laws, particularly Chapter 19, Laws 1927, and Chapter 175, Laws 1929, to ascertain the definition of the terms "dealers," "distributors," "gasoline," "motor vehicle," and other terms, and to determine the method of collecting the tax, the amount of penalties and interest upon delinquency in the payment of the tax, the extent of the penalties for failure or refusal to furnish the statements to the state board of equalization required by law, the establishment and method of enforcing a lien for the taxes, and the like, in order to carry out the provisions of Chapter 95.

6. The Act is further attacked for the alleged reason that it violates section 2 of Article XIII of the Constitution in that it could not come into existence as *a law* until it had received a majority of the votes cast for and against it at an election and after proclamation by the governor announcing

such approval by the electors. The argument is predicated upon the provisions of section 25 of the Act, which reads: "This Act shall be in full force and effect from and after its passage and approval and proclamation to that effect by the governor, providing the same shall have received a majority of the votes cast for and against it at the election herein called."

It is urged that the legislation is not effective for any purpose until it becomes operative, and since the Act under consideration could not come into effect as *a law* until a majority of the electors had approved it by their vote and the governor had proclaimed the result, there was *no law* authorizing the election which was held. This contention is without merit.

Under the provisions of section 2 of Article XIII of our Constitution, *a law* authorizing the incurring of an indebtedness in excess of $100,000 must be submitted to the people at a general election and receive a majority of the votes cast for and against it, before such indebtedness may be legally incurred. Thus it is plain to be seen from the language employed that it is *laws* authorizing the incurring of such an indebtedness which are required to be submitted to the people, rather than an Act proposed. The people are required to pass only upon the question of the creation of a debt or liability and the means of obtaining the necessary revenue to meet and pay the obligation proposed to be incurred, not upon the law authorizing it, nor upon the machinery of the law whereby the question of creation of the indebtedness is submitted to the people at a general election. After passage by both the House and the Senate, it became *a law* in full force and effect as soon as the governor gave it his approval on March 3, 1931. However, it did not become operative, so far as the incurring of the indebtedness by it proposed, until the general election was held as by it provided on May 5, 1931, and the proclamation by the governor made of the result of the election, showing that the incurring of such indebtedness was by the people approved.

It is *the law* authorizing the indebtedness and providing revenues for its payment which must be submitted to the

electors, and that is the *law* which was in fact submitted and voted upon pursuant to the machinery prescribed in the Act, in order that a fair expression of the people could be had thereon, and none who were entitled to vote denied such privilege. It became in full force and effect as a law "after its passage and approval" by the governor, and all that remained was the submission of *such law* to the qualified electors on the question as to whether the state indebtedness proposed and means of payment should be approved. Though the indebtedness authorized could not be incurred without submission of the question to the electors and obtaining their approval, the Act providing for the election to submit the question was none the less *a law* regularly passed by the legislature and approved by the governor. It needed nothing further to give it vitality. The voters had nothing whatsoever to do with its enactment, but under its provisions, in conformity with constitutional requirements, were called upon only to pass on the question as to whether the indebtedness proposed by it should be incurred. It contains all of the completeness of *a law* regularly enacted by the legislature and approved by the governor, and the mere fact that it provided the machinery for submitting the question to the people as to whether the indebtedness should be incurred and means provided for its payment, does not render it any the less *a law* of this state. No good reason exists why the law should not thus provide its own system of submission of the question to the people rather than enacting an independent statute.

That *the law*, as a complete statutory enactment, was by the legislative assembly submitted to the people for approval as required by the Constitution, is clearly shown by section 11 of the Act set forth above. It constitutes a referendum of the law for the creation of an indebtedness, but it is in no sense the character of referendum contemplated by section 1 of Article V of the Constitution, nor was it intended as such.

7. It is urged that the Act violates section 23 of Article V of our Constitution, in that the subject is not clearly expressed in the title. It is pointed out that the title of the

bill indicates that the Act is to provide "a tax on gasoline," "an excise tax on gasoline," and a "license tax on gasoline," whereas in the body of the Act the tax is imposed upon distributors and dealers for engaging in the business.

The Constitution authorizes the imposition of a license tax upon persons and corporations for "doing business in the state," rather than upon a particular commodity (sec. 1 of Article XII), and the question arises as to whether the title is sufficiently comprehensive to permit the exaction of the tax for engaging in the business of distributor or dealer "for the purpose of providing funds for the payment of the interest and the maturing principal of the State Highway Treasury Anticipation Debentures" provided for in the Act. In the body of the Act, by the terms of section 9, "every distributor referred to and defined in Initiative Measure No. 31, effective January 1, 1927, and in Chapter 19 of the Laws of Montana, 1927, and Chapter 92 of the Laws of Montana, 1929, shall pay * * * to the State Board of Equalization for deposit into the State Treasury, a license tax for engaging in and carrying on such business in this State in an amount equal to five cents (5¢) and for each year after March 31, 1941, equal to three cents (3¢) for each gallon of gasoline refined, manufactured, produced or impounded by such distributor and sold by him in this State or shipped, transported or imported by such distributor into and distributed and sold by him within this state, after it has arrived in and is brought to rest within this state, whether sold in the original packages or in the broken packages during such year; provided that all gasoline delivered by any distributor to any of his service stations in this state shall be deemed to have been sold and shall be treated and considered in computing such license tax in the same manner as though the same had been sold to dealers or to other persons."

We are of the opinion that the title is sufficiently expressive of the purpose of the Act. No one would be misled or deceived. It clearly appears that the debentures are to be paid from a license tax to be obtained under the Act from gasoline, which

could not constitutionally be levied on the commodity itself. Every law is presumed to be constitutional, and all doubts are to be resolved in favor of upholding the law (*State* v. *McKinney*, 29 Mont. 375, 1 Ann. Cas. 579, 74 Pac. 1095, 1096); and, accordingly, from the title it is to be presumed that the license tax is imposed constitutionally upon the persons or corporations engaged in the business of distributing and selling gasoline. Although the tax is imposed on the business, it may be that the distributor or dealer passes it on to the consumer. (*State* v. *Sunburst Refining Co.*, 76 Mont. 472, 47 A. L. R. 969, 248 Pac. 186.) By this constitutional provision it is intended only that the Act shall be germane to the subject expressed in the title. It is not necessary that the title shall embody the exact methods of application or procedure, where the general object is plainly expressed. And where the degree of particularity necessary to be expressed in the title of the Act is not indicated by the Constitution itself the courts should not embarrass legislation by technical interpretations based upon mere form or phraseology. (*State* v. *Anaconda Copper Min. Co.*, 23 Mont. 498, 59 Pac. 854.) The test is whether the title is of such a character as to mislead the public or members of the legislature as to the subjects embraced in the Act. (*Evers* v. *Hudson*, 36 Mont. 135, 92 Pac. 462.)

"The legislature is the judge, to a great extent, at least, of the title which it will prefix to a bill; and the court has no right to hold a title void because, in its opinion, a better one might have been used. * * * The title is generally sufficient if the body of the Act treats only, directly or indirectly, of the subjects mentioned in the title, and of other subjects germane thereto, or of matters in furtherance of or necessary to accomplish the general objects of the bill, as mentioned in the title. Details need not be mentioned." (*State* v. *McKinney*, supra.) The function of the judiciary is to give effect to the legal acts of the legislature, not to supervise them. (*Myrick* v. *Peet*, 56 Mont. 13, 180 Pac. 574.) And where a legislative Act is attacked on the ground of its unconstitu-

tionality the question presented is not whether it is possible to condemn it, but whether it is possible to uphold it, the presumption being in favor of its validity, and it must be upheld unless its unconstitutionality appears beyond a reasonable doubt. (*Martien* v. *Porter*, 68 Mont. 450, 219 Pac. 817; *State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841; *State ex rel. Diederichs* v. *State Highway Commission*, supra.)

The words employed in the title clearly indicate that by the Act the tax to be imposed is a license or excise tax, which, under the Constitution, can only be imposed upon persons or corporations for engaging in the business. It is in our opinion sufficiently comprehensive to embrace the subject covered by the Act.

8. It is further argued that Chapter 95 of the Laws of ▆▆▆▆ 1931 is invalid (a) because it attempts to amend Chapter 6 of the Laws of 1931 without re-enacting or publishing it at length as amended, and (b) for the reason that it attempts to amend Chapter 92 of the Laws of 1929, without re-enacting or publishing the same at length, in violation of section 25 of Article V of our Constitution. That section reads: "No law shall be revised or amended, or the provisions thereof extended by reference to its title only, but so much thereof as is revised, amended or extended shall be re-enacted and published at length." There is no merit in the contention.

(a) Chapter 95 of the Laws of 1931 makes no reference to Chapter 6 of the Laws of 1931, and since the latter mentioned law had served its purpose, it is plain that it was the legislative intent to supersede it by the enactment of Chapter 95. All that Chapter 95 attempts to do is to extend the period for the payment of the license tax, authorized by Chapter 92 of the Laws of 1929, until March 31, 1941, and this is accomplished not by merely a reference but additionally by a complete re-enactment.

(b) Chapter 95 of the Laws of 1931 is utterly inconsistent with the provisions of Chapter 92 of the Laws of 1929, in so far as the time during which the license tax is to be exacted, and in so far as there is conflict, the provisions of Chapter 92

are repealed by implication. The two conflicting time provisions cannot both stand. Therefore the last enactment must take precedence as the law, intended, as it manifestly was, to warrant the collection of the license tax by an irrepealable statute so as to protect the integrity of the debentures and insure their payment.

9. Other arguments advanced against the constitutionality of the Act have been given earnest consideration, but in our opinion are not of sufficient merit to warrant an extension of this opinion in discussion of them

The relief prayed for is denied and the proceeding is dismissed.

All the Justices concurring.