ROBERT L. BLAND, Judge,
dissenting.
Since I do not concur in the above awards in the aggregate sum of $21,000.00 it becomes my mandatory duty to state the reasons for my nonconcurrence. If it be said that a dissent is but an “idle gesture” I answer that it should not be so treated when it deals with a proposed appalling appropriation of the public revenue. The requirement in the court act of a dissenting opinion is a wise provision. It is intended to give notice to the Legislature that the members *146 of the court who have investigated the claim in question are not in agreement as to the proper recommendation to be made for its disposition and thus afford the Legislature an opportunity to make reexamination of the claim before making what might prove to be an improper appropriation for its payment.
It is true that the Legislature of 1943 paid slight heed to the arduous work of the court of claims — its special instrumentality — but ratified and approved, apparently without examination or scrutiny, awards totaling more than one hundred thousand dollars, except in the case of two claims for indemnity on account of alleged negligence of county school board officials, which had later been disapproved by majority members of the court. Seemingly it should be the duty of the Legislature to carefully scrutinize and examine all awards made by the court of claims — however carefully and painstakingly they may have been made — before making appropriations for their payment. The record of each claim considered by the court, including all documents, papers, briefs, transcripts of testimony and other materials, are preserved by the clerk and are made available to the Legislature or any committee thereof for the reexamination of the claim. (Court act, section 24). It is the court’s duty to make thorough investigation of claims asserted against the state and make recommendations concerning them. These recommendations are not conclusive. The responsibility for making appropriations rests with the Legislature. Our awards do not have the effect of judgments obtained in courts of law. They are merely recommendations, after careful investigation and study, subject to ratification or rejection by the Legislature.
There is a limitation upon the right and power of the Legislature to make appropriations for payment of the public funds of the state.
The Legislature is without power to levy taxes or appropriate public revenues for purely private purposes, but it has power to make an appropriation to a private person in *147 discharge of a moral obligation of the state, and an appropriation for such purpose is for a public, and not a private, purpose. Woodall v. Darst, 71 W. Va. 350
I do not believe that the claims in the instant cases are founded on justice or supported by moral obligation, or that the state is responsible for the unfortunate and pathetic mishap which resulted in the six deaths for which the awards are made by majority members of the court. I do not see the picture of the accident in the light in which it is reflected by the majority opinion.
The theory on which these claims are prosecuted is alleged negligence on the part of the state road commission in failing to have necessary warning signs of danger on the highway.
The proof offered in support of the claims fails to show that the said highway on which the fatal accident happened was not reasonably safe for travel) thereon by day or by night. On the contrary the evidence conclusivelly shows, I think, that the road at the time of said accident was safe for those who comply with the law and use reasonable precautions.
The accident occurred on a mountainside in the nighttime. There was no eye witness to it. The exact cause of the accident is highly problematic and conjectural. No one can say just how it happened, but certain deductions may reasonably be made from circumstances attending it.
As is disclosed by the record, the occupants of the automobile, ranging in age from sixteen to twenty-one or twenty-two years, were returning from Montgomery to Oak Hill. Up about six or seven miles the road follows the river, then makes a sharp left-hand turn and proceeds over a mountain. On the right of this curve there was a steep embankment. This first curve was successfully negotiated. However, there was another small turn after the main turn was passed. Claimants *148 contend that this little turn, which they describe as a “double S” curve, was lower in elevation than the rest of the road. It was at this point that the automobile was precipitated over the embankment, resulting in the death of 'all six occupants of the vehicle.
It is contended that the condition of the road at the point of this last mentioned curve was responsible for the accident. I am not prepared to concede this to be a fact.
The accident happened about 10:45 o’clock on the night of January 26, 1941. It is shown that there was no guardrail, curve sign or road marking of any kind at or near the point where the fatal automobile left the road.
After the occurrence of the accident trooper J. M. Ballengee, a member of the department of public safety, made an investigation of the accident and an examination of the highway at and near the point where it occurred. From information given by him to A. L. McMillion, assistant maintenance engineer, district one of the state road commission, the latter caused a further investigation and survey to be made under his direction and supervision. A plat or map showing this actual survey was introduced in evidence upon the hearing of the claims.
Trooper Ballengee testified on behalf of the claimants and Mr. McMillion was introduced and testified as a witness on behalf of the state. The testimony of trooper Ballengee was not of material aid in determining the cause of the accident. He testified very clearly as to the point where the automobile was precipitated over the embankment. He gave it as his opinion that the automobile was driven straight over the embankment at the point of a 'small curve and that the road dips slightly right at that particular place “not very much, but there was a slight dip in the road there.” He stated the width of the road at that point to be eighteen feet. He further stated that cars could get over the road all right at the point of the accident.
*149 Trooper Ballengee testified that he made examination of the tire marks found on the highway and that the tread of the tires was well defined. He stated that the tire marks started at a certain point “and angled off into this small curve.” He located on a photograph the point on the road from which the tire mark started before angling off into the small curve where the vehicle went over the embankment and identified such point by placing his initials on the picture. From the same information communicated by him to engineer McMil-lion the latter caused a survey of these tire marks to be made and delineated on a plat. This plat shows the path of the outside wheels of the automobile as pointed out by trooper Bal-lengee. It further shows that the automobile left the paved portion of the highway on the embankment side of the road and ran on the berm for a distance of twenty feet when the car turned over the embankment at the point where the small curve started to reverse. It may be that the driver of the car lost control of the wheel at the point twenty feet distant from this small curve where it left the paved portion of the road and ran on the berm until it went over the embankment at the small curve. The survey shows that at the point where the car left the outer edge of the road the pavement was fourteen feet in Width and the berm at that point on the embankment side of the road was six and a half feet in width, while on the mountainside the berm was approximately three feet in width. Thus it is made clear that the automobile started to leave the highway at a point where it was twenty-three and one-half feet wide. After rounding the first large curve where the road leaves the river the automobile traveled a distance of fifty-two feet to the point where it started to leave the road at which point it was twenty-three and one-half feet in width. It is shown that the road had an average grade of seven per cent and was of sufficient width to enable automobiles to travel thereon in safety. There was no occasion for a warning sign of danger to be placed at or near the point where the car started to leave the paved portion of the road. So far as the evidence discloses the highway was in good condition. Naturally any road that traverses a mountainside is *150 attended by more or less danger. Persons using such a road are charged with the duty of exercising care and caution.
In re claim no. 13, Rachel C. Lambert, Admx. v. State Road Commission, 1 Ct. Claims (W. Va.) 186, we held:
“Where the evidence in the case shows the highway on which the accident happened was improved and eighteen feet wide, with no obstruction and no defect in the highway, and the claimant’s decedent was killed by reason of the car in which he was riding leaving the said highway and striking a depression or hole in the berm, then there is no cause of action against the state road commission and the claim will be denied and dismissed.”
In re claim no. 118, Marguerite Smith v. State Road Commission, 1 Ct. Claims (W. Va.) 258, we held:
“When an adult woman of good intelligence, while driving her husband’s automobile on a state highway passes a hole on one side of said highway caused by a break or slip on the rock base of said highway, which hole she could or should have seen by the use of ordinary care, and on the same day, in the daytime thereof, while driving said automobile in the opposite direction derives it into said hole and the said automobile is precipitated over an embankment and she sustains personal injuries in consequence of said accident, she will be held to be guilty of contributory negligence barring a claim for an award for damages occasioned by said accident.”
Under the act creating the court of claims, negligence on the part of the state agency involved must be fully shown before an award will be made. Moore v. Road Commission, 1 Ct. Claims (W. Va.) 93; Miller v. Road Commission, 1 Ct. Claims (W. Va.) 97.
I do not see that claimants have established a case of negligence on the part of the state road commission entitling them to awards. It appears from the evidence that the highway on which the accident happened was an improved primary *151 road of good grade and in generally good condition. It is shown that it was extensively used and it does not appear that an accident had theretofore occurred thereon. Too much emphasis, I think, is placed upon the alleged' defective condition of the road at the particular point where the automobile went over the embankment and it is not proved to my satisfaction that the condition of the road at that point was the proximate cause of the accident. On the contrary, I believe that the loss of control of the automobile by the driver thereof when the machine left the road where it was twenty-three and one-half feet in width was responsible for the accident. I think, moreover, that the occupants of the car were guilty of contributory negligence. Since they were returning from Montgomery to Oak Hill, it would seem that they had previously traveled the road from Oak Hill to Montgomery. It is not shown that the road was actually out of repair at the immediate point where the car went over the embankment. The fact that the road at the particular point where the automobile went over the embankment sloped more, that is that the elevation was turning more to the right side of the road, does not establish negligence on the part of the road commission in maintaining the road at that point. It was proper for the curve to have the elevation in that direction. The road sloped in the direction of the embankment in order to accommodate traffic. As very clearly indicated by engineer Mc-Million, the elevation of any curve is supposed to have a super-elevation so as to make it easy for the traffic in the curve. The condition of the slope or elevation in the curve at the point where the automobile went over the embankment was in line with engineering principles. All curves are elevated.
The absence of warning signs of danger on this mountainside road does not establish negligence on the part of the state road commission warranting or justifying the awards made in these cases. The very fact that the road was on a mountainside was sufficient to put the occupants of the car on notice and cause them to use care and caution as they proceeded thereon. Weather conditions also rendered it expedient for them to pay particular attention to the road. The *152 fact that a roll of wire had been placed1 alongside of the highway is not significant or a circumstance tending to show negligence. It frequently happens that wire and other equipment for use in road repair and maintenance are placed at intervals on the roadside for purposes of convenient access and use. A white line on the road is only intended to indicate the side of the road to be used and the presence of a white line on the road in question would1 not have prevented the accident under the circumstances disclosed by the evidence. I know of no obligation that rests upon the road commission to build and maintain retaining walls on mountainside roads. Such policy would be prohibitive. All that the state is required to do, in my opinion, is to make roads reasonably safe for public use and that seems to have been done on route 61. The state road commission is vested with certain discretion as to when and where it will make repairs on a state controlled highway.
As observed by Judge Elswick in the opinion in re claim No. 12, Harper v. Road Commission, 1 Ct. Claims (W. Va.) 12, “The State is not an insurer as to the condition of its roads.” And, as we have heretofore stated, “The mere fact of injury received on a state highway raises no presumption of negligence on the part of the state road commission.”
While it is true that since our determination of claim No. 17, Charles Golden Fry v. State Road Commission, 1 Ct. Claims (W. Va.) 48, the court of claims 'has held:
“1. When the state road commission by the act of 1933 assumed! control and authority over the primary and secondary roads of the state, the duty was imposed upon it to guard all dangerous places on the public roads and bridges by suitable railings or barriers, so as to render the said roads and bridges reasonably safe for travel thereon by day or by night.
“2. When the claimant is charged with contributory negligence which from the evidence presents a mixed question of law and fact, and on which reasonable minds may differ, the question of such negli *153 gence will be considered in determining whether or not an award should be made, and, if made, the amount thereof.”
I am of opinion that such holding should be disapproved and reversed. We based our opinion in that and subsequent cases on Wells v. County Court, 85 W. Va. 663, 102 S. E. 472, in which it was held:
“The law imposes upon a county court or other public authority in maintaining public roads and bridges, the duty to so guard all dangerous places by suitable railings or barriers as to render them reasonably safe for travel thereon by day or by night.”
Such holding of the Appellate Court in that case was based upon an existing statute imposing liability upon county courts. Acts of the first extraordinary session of the Legislature of 1933 imposes no such liability on the state road commission. Section 35, article 6 of the constitution forbids the enactment of such a statute. The state road commission of West Virginia is a direct governmental agency of the state, and as such is not subject to an action for tort. Mahone v. State Road Commission, 99 W. Va. 397, 129 S. E. 320. A state cannot be sued without its consent, and is immune from suability for torts of its' agents and officials. Wilson v. State Highway Commissioner, (Va.) 43 S. E. (2d Ed.) 746. The immunity of a state from liability for torts of its servants and agents rests on public policy. Id. The state cannot waive its constitutional immunity from suit. Chapter 20 of the acts of the Legislature of 1941, creating the court of claims made no change in this fundamental law. The jurisdiction conferred by the act upon the court of claims to consider claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state or any of its agencies which the state as a sovereign commonwealth should! in equity and good conscience discharge and pay, does not increase or enlarge the liability of the state, but merely provides a forum wherein claims against the state may be adjudicated. This was so held by court of claims of the state of Illinois in construing a statute almost identical with our court of claims act.
*154 The express purpose of the court act is to provide a simple and expeditious method for the consideration of claims against the state that, because of the provisions of section 35, article 6 of the constitution of the state, and of statutory restrictions, inhibitions or limitations cannot be determined in a court of law or equity. The constitutional immunity of the state from suit should at all times be borne in mind. The court is not invested with and does not exercise the judicial power of the state in the sense of article VIII of the constitution of the state. Its duties are limited to the investigation of claims filed against the state which cannot be maintained in courts of law or equity and recommending the disposition thereof to the Legislature. The court is, therefore, distinctly an investigating and advisory commission. It deals only with claims against the state which as a sovereign commonwealth it should in equity and good conscience discharge and pay. It was not the intention of the Legislature, I think, that the court of claims should make awards éxcept in cases where claims should be ascertained to be just and proper within the contemplation and meaning of the court act. And in the application of this statute it should be the obligation of the court to consider its objects and purposes, “and the condition of affairs which led to its enactment, so as to effectuate rather than destroy the spirit and force of the law which the Legislature intended to enact.”
I d'o not believe that the claims are claims for which awards should be made. I do not think that the awards made are just and proper or that the court of claims had authority to make them. The claims are not shown to be supported by either legal or equitable obligation. They grew out of an unfortunate automobile accident. Such an accident is liable to occur at any time on any road when three boys and three girls, filled with the exuberance and gayety of youth, while riding in an automobile fail to observe necessary care and precaution for their safety.
I would deny the awards and dismiss the claims.