STATE *ex rel.* THE BALTIMORE AND OHIO RAILROAD COMPANY

*v.*

EDGAR B. SIMS, *Auditor.*

(No. 10071)

Submitted September 1, 1948. Decided September 21, 1948

14

*Ambler, McCluer & Davis,* for relator.

*Ira J. Partlow,* Attorney General, and

*Eston B. Stephenson,*

Assistant Attorney General, for respondent.

FOX, JUDGE:

In the year 1914 the Parkersburg-Ohio Bridge Company contemplated the erection of a highway bridge over the Ohio River at Fifth Street, in the City of Parkersburg, West Virginia. It was intended that the proposed bridge should pass over the tracks of the Baltimore and Ohio Railroad Company, and it was necessary to secure its consent to the construction of the same. On October 20, 1914, the railroad company and the bridge company entered into an agreement, under which authority was granted by the railroad company to the bridge company to build that part of the structure which passed over said tracks, in accordance with plans to be approved by the railroad company.

Paragraphs 5 and 7 of the said agreement are involved in this proceeding, and read as follows:

"5. The Bridge Company shall assume and bear and indemnify the Railroad Company against all loss or damage which said Railroad Company or its employees or property may suffer on account of any accident caused by or in any way growing out of the construction, maintenance and operation of said bridge, whether the negligence of the employees of the Railroad Company contributes to said accident or not, and the

Bridge Company shall assume and bear and indemnify the Railroad Company against any injury to said bridge caused by the operation of trains.

\* \* \*

"7. This agreement shall be binding upon and be for the benefit of the parties hereto, and their successors and assigns, and any Railroad Company operating over the tracks of the Railroad Company."

At this point we think it well to state that, in our opinion, the provision of the agreement making it binding on the successors and assigns of the bridge company, constituted, as between private parties, the equivalent of a covenant running with the land; and that any person or private corporation taking over the bridge property, in so doing, assumed the burden of the indemnity provision of the agreement quoted above.

The title to the bridge constructed under the agreement aforesaid became vested, prior to June 30, 1937, in David B. Crawford and John M. Crawford, on which date they conveyed the same to the State of West Virginia. Along with the physical property and other rights conveyed, there was specifically granted and conveyed unto the State "all the rights, privileges and franchises granted by the Baltimore and Ohio Railroad Company to the said Parkersburg-Ohio Bridge Company by contract dated October 20, 1914, recorded in Deed Book 165, page 26, in the office of the Clerk of the County Court of Wood County, West Virginia, which rights, privileges and franchises were, after intermediate conveyances, conveyed by the Parkersburg Community Bridge Company to the said David B. Crawford, and John M. Crawford by said deed of May 20, 1937, above referred to."

It appears from the facts stipulated by counsel that, in the construction of the bridge, it was necessary to place a steel girder or pier to support the overhanging bridge,

and that there was close clearance between the tracks of the railroad company under the bridge and said girder. On February 9, 1945, Neal Riley, an employee of the railroad company, was seriously injured in the course of his employment, in assisting in moving a baggage or mail car in the yards of the railroad company, while passing under said bridge. Immediately the railroad company advised the State of West Virginia of the accident, and inquired of the State its attitude toward compensating Riley therefor. The State, through its Attorney General, disclaimed any character of liability to the injured party, and advised the railroad company that it would not defend any action which might be instituted by him against the railroad company, and would deny liability to the railroad company for any moneys which might be paid by it as compensation to such injured person. Thereupon, the railroad company, being threatened with suit, made a settlement with Riley for the sum of $1,850.00, and shortly thereafter filed with the State Court of Claims a claim for said amount. The Court of Claims, on May 14, 1946, recommended the payment to the railroad company of said sum of $1,850.00, and certified its award to the Director of the Budget, who included the sum in a proposed appropriation to be made by the Legislature. At the Regular Session of the Legislature, 1947, an appropriation was made for the amount of the said award, the payment of the same being expressly declared by the Legislature to be a moral obligation of the State. The State Road Commissioner made a requisition upon the State Auditor for the amount of said appropriation, and on April 15, 1947, payment thereof was declined by the Auditor, who stated: "The basis of all these claims appears to be a negligence or negligent acts of State agents or employees. The State, under the Constitution, is not liable for the negligence or tortious acts of its agents or employees. Considering the nonliability of the State, to pay these claims would be tantamount to making gifts of public funds prohibited by Article 10, Section 6 of the Constitution. * * *." The reasoning of the Auditor does not seem to apply to the case presented, but it was effective

to deny payment of the appropriation. Following the action of the Auditor, this proceeding was instituted.

We have not gone into detail as to the nature and extent of the injuries sustained by Neal Riley. We are of the opinion that the railroad company was within its rights in making the settlement of Riley's claim, after the State had refused to do so; and, there being no evidence to the contrary, we proceed on the assumption that the amount paid was fair and reasonable for the injuries sustained.

It will, of course, be apparent that the sole question here involved is the constitutional power of the Legislature to declare the payment of this claim a moral obligation of the State, for which an appropriation of public funds may be made. This question has been before this Court in numerous cases. *Woodall v. Darst,* 71 W. Va. 350, 77 S.E. 264; *Glover v. Sims,* 121 W. Va. 407, 3 S.E. 2d 612; *Cashman v. Sims, Auditor,* 130 W.Va. 430, 43 S.E. 2d 805; *Adkins v. Sims,* 130 W. Va. 645, 46 S.E. 2d 81, *Bennett v. Sims,* 131 W. Va. 312, 48 S.E. 2d 13. The case of *Woodall v. Darst, supra,* was based upon a statute. The case of *Glover v. Sims, supra,* grew out of an implied contract for supplies furnished to a reputed agency of the State, and used by it in promoting the athletic program of the State University. The other cases cited involved alleged negligence on the part of the State and its employees, all sounding in tort.

In the cases cited involving alleged negligence, a rule was laid down defining situations out of which a moral obligation of the State to pay a claim resulting from negligence of employees of the State, might arise. That rule is stated in *Cashman v. Sims, supra,* and is this:

"To constitute a valid declaration by the Legislature of the existence of a moral obligation of the State for the discharge of which there may be an appropriation of public funds in the interest of public welfare, it is necessary, as a general

> rule, that there be an obligation or a duty by prior statute created or imposed upon the State, to compensate a person for injury or damage sustained by him by reason of its violation by the State or any of its agencies, or to compensate him for injury, damage or loss incurred by him in or by his performance of any act authorized or required by such statute; or an obligation or a duty, legal or equitable, not imposed by statute, but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons."

We see no reason why this rule, applied in tort cases, should not be applied to cases involving an alleged contractual obligation such as we have in the case at bar. The same principle was applied in *Glover v. Sims, supra.* We are of the opinion that the contract between the bridge company and the railroad company dated October 20, 1914, created a binding obligation on the bridge company, and its successors in title, to indemnify the railroad company against liability for accidents such as the one present in this case, so long as the title to the bridge remained in the hands of a private individual, firm or corporation. When the State acquired title to the bridge, it did not directly assume the obligation of the said contract, and could not have legally done so; but if the transfer so made had been to a private individual, firm or corporation, rather than to the State, the failure directly to assume the obligation of the 1914 contract would not have been material, because, in taking over the property, such private individual, firm or corporation would have been bound by what we think amounts to a convenant running with the land. All this being true, there would have been a liability against the owner of the property, in favor of the railroad company, and, but for a situation peculiar to this case, under the rule in the *Cashman* case quoted above, there would have been laid the foundation for a declaration, on the part of the Legislature, of a moral obligation to pay

the claim. But, in our opinion, Section 6 of Article X of the Constitution of this State is an absolute barrier to relator's claim. That section reads as follows: "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; *nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person;* nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever." (Emphasis ours).

The moral obligation of the State to pay relator's claim is, of course, based upon the taking of title by the State to the bridge in question, as to which bridge the railroad company holds a contract indemnifying it against loss by reason of any liability against it growing out of the construction and operation thereof. The contract of October 20, 1914, did not assume to give any right to a person suffering an injury growing out of the construction or operation of the said bridge, as against the State, and could not have done so, because Section 35 of Article VI of the Constitution provides that: "The State of West Virginia shall never be made defendant in any court of law or equity * * *", with an exception not here important. The said contract was clearly a contract of indemnity by which, according to relator's claim, the State may expend public moneys to relieve and indemnify the railroad company against liability resulting from the injury of one of its employees, or to any other person, growing out of the construction and operation of the bridge involved. We assume that no one will contend that an official of the State, even with legislative authority, could legally enter into such contract of indemnity, for the Constitution says "* * * nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person * * *." It would be difficult to frame a more definite prohibition of such assumption of liability. The question then naturally arising is this: If the State, even by legislative action, cannot assume such

liability, can the Legislature, under the guise of what it terms a moral obligation, evade the plain provision of the Constitution and thus recognize an obligation which the Constitution says it could never assume, by the appropriation of public money therefor? We do not think the Legislature possesses that power. What the Legislature cannot do directly, cannot be done by indirect methods.

But it may be said, on the theory that the undertaking of the bridge company, contained in the agreement of October 20, 1914, was the equivalent of a covenant running with the land, that the purchaser of the bridge could not acquire title thereto without assuming the obligation of that agreement. This is a perfectly legitimate, plausible and correct contention, so long as the bridge remains the property of an individual, firm, or private corporation; but we do not think the principle can be carried to the extent of evading an express provision of the Constitution of this State.

We are asked to consider this case as analogous to one where the State acquires title to property covered by the lien of a deed of trust, or, we might say, any other character of lien existing against the property acquired by it. That is an entirely different proposition from an indemnity agreement operating in the future. Of course, in a case where the State acquired property covered by an existing lien, it could not, under the constitutional provisions against the taking of private property without compensation, or depriving citizens of property without due process of law, hold the same free of such lien.

Citizens entering into agreements of any character are always required to do so with knowledge of the right of the sovereign, through the exercise of its power, to modify their terms within reasonably definite limits. In the instant case, the relator was required to take into consideration the possibility that at some time in the future the property of the bridge company, out of which the indemnity contract aforesaid grew, might be taken over by the

State of West Virginia, or by its agencies, in which event the constitutional provisions limiting the right of the State in the matter of the assumption of the obligations and liabilities of former owners of such property would attach and control. This is exactly what happened in this case. The relator might have protected itself against the alleged deprivation of a valuable right under its agreement with the bridge company, by intervening in the negotiations for the sale of the bridge to the State. It may be that it had no knowledge of such negotiations or sale; but even that is not sufficient to preserve in it a right, as against the State, which can be made the basis of a moral obligation to pay the claim involved, when the Constitution provides that such right shall never exist as against the State. Had the State proceeded to acquire title to the bridge by condemnation, the rights of the railroad company would have been necessarily involved, and adjustment could have been made for the value of its contract rights. This procedure was not taken, and the result is that the railroad company, perhaps without notice, is deprived of a valuable indemnity provision; but that deprivation develops, not from any positive act, which might be said to deprive the relator of a valuable right without due process of law, but from a plain and unmistakable denial of legislative power, by any method whatever, to recognize, assume or pay the liability of the carrier to its injured employee, a denial which this Court cannot disregard.

The writ prayed for will be denied.

*Writ denied.*