A. S. PRICE

*v.*

EDGAR B. SIMS, *Auditor of State of West Virginia*

(No. 10213)

Submitted January 11, 1950. Decided March 28, 1950.

Fox, JUDGE, and LOVINS, PRESIDENT, dissenting.

*Kaufman & Boiarsky, Paul J. Kaufman, John G. Hackney,* for petitioner.

*William C. Marland,* Attorney General, *Eston B. Ste-phenson,* Assistant Attorney General, *Milton S. Koslow,* for defendant.

HAYMOND, JUDGE:

This is an original proceeding in mandamus in which the petitioner, A. S. Price, seeks a writ from this Court to compel the defendant, the Honorable Edgar B. Sims, Auditor of the State of West Virginia, to issue a warrant in due form upon the State Treasurer for the payment of a legislative appropriation in favor of the petitioner for $300.00. The claim of the petitioner against the State Road Commission, for the payment of which the appropriation was made, is for damages to his truck caused by the sudden collapse of a public bridge over a small stream known as Copen Branch of Kanawha Two Mile Creek in Kanawha County, West Virginia. Upon a hearing the State Court of Claims, on February 2, 1949, by a two to one decision, allowed the claim and awarded the petitioner the sum of $300.00.

At its regular session in 1949, by Senate Bill No. 277, passed March 12, 1949, effective July 1, 1949, and approved by the Governor, the Legislature of West Virginia, in considering a number of claims by different persons against the State and some of its agencies, including the claim of the petitioner against the State Road Commission, adopted as its own the findings of fact of the State Court of Claims, its creature and special instrumentality, as to his claim, declared it to be a moral obligation of the State, and directed the Auditor to issue a warrant for its payment from available funds appropriated for that purpose. Chapter 15, Acts of the Legislature, 1949, Regular Session. The Legislature also made an appropriation for the payment of the claim in the amount of the award. Chapter 9, Acts of the Legislature, 1949, Regular Session. Following this action of the Legislature, the petitioner was informed by a representative of the State Road Commission that it would be "necessary for the State Auditor to pay the award sometime after the first day of July, 1949." After that date the petitioner, by his attorney, communicated

with the defendant and demanded payment of the claim. By letter to the attorney for the petitioner, dated July 18, 1949, the Auditor refused payment for the reason "that the State cannot pay out money except for services rendered, or materials, goods or land used. This claim is based upon a tort, the negligence on the part of the State employees which I do not feel is compensable under the West Virginia Constitution."

Payment having been refused by the Auditor, the petitioner instituted this original proceeding in this Court on September 20, 1949. The defendant filed his written demurrer to the petition and on January 11, 1950, the issues arising upon the petition and the demurrer were submitted for decision upon the briefs in behalf of the respective parties.

The facts upon which the claim is based and the findings of the court of claims with respect to them, adopted by the Legislature, are set forth in the opinion of the court of claims, are incorporated in the petition, and are shown in the evidence taken before the court of claims, which is a part of the record in this proceeding. As to all matters, except a disagreement between petitioner and representatives of the State Road Commission as to the weight of the load on the truck at the time of the accident, the facts are not disputed.

During the year 1948, the petitioner was engaged in cutting timber on lands near Whittington Hill on Copen Branch of Kanawha Two Mile Creek in Kanawha County, and in hauling the logs which he had cut to a saw mill located several miles away for the purpose of converting them into lumber for sale in nearby markets. In so doing he transported the timber by trucks which were driven over a wooden bridge located across the stream. This bridge was under the control and the supervision of the State Road Commission, an instrumentality of the State. By statute then and now in force and effect, the State Road Commissioner is required to inspect all bridges under the control of the commission and promptly to con-

demn, close and repair any such bridge which is found to be unsafe, and the State Road Commission is required to post and maintain, at each end of all bridges over which it has jurisdiction, clearly legible notices indicating to travelers upon the road the maximum safe load or weight that may pass over any such bridge at any one time. Section 33, Article 4, and Section 35. Article 8, Chapter 40, Acts of the Legislature, 1933, First Extraordinary Session. The bridge was out of repair but its unsafe condition was not known to the petitioner or his employees who operated his trucks upon it without mishap for some time before the accident which gave rise to his claim. On one side of the bridge a wooden cross beam or stringer which served as a support had rotted at one end. Though various residents of the neighborhood had made complaint to representatives of the commission concerning the condition of the bridge, it had not been inspected or repaired and no notices relating to the maximum safe load or weight that could pass over it had been posted for several years before the bridge collapsed and damaged the property of the petitioner.

On June 24, 1948, a truck of the petitioner, carrying a load of logs, was driven at a low speed upon the bridge by an employee of the petitioner. A stringer, sixteen feet in length which had rotted at one end, suddenly broke, causing the bridge to collapse and throwing the truck from the bridge into the stream where it overturned. As a result the truck was damaged in an amount in excess of $300.00. The truck was licensed to carry a load of three tons, but the testimony of the petitioner and a witness in his behalf is that the load on the truck at the time of the accident, consisting of sixteen logs from twelve to eighteen inches in circumference and from eight to twelve feet in length, containing 319 feet of lumber which they measured, weighed 2,233 pounds according to a standard scale of weight of seven pounds per foot. The State Road Commission contended that the truck was overloaded and that the lumber on it weighed seven or eight tons but the witnesses who gave this estimate did not measure or

weigh the logs but based their statement of the weight upon their view of the logs which they saw in the water after the wreck. The testimony relating to the weight of the load shows clearly that the truck was not overloaded when the bridge collapsed. Upon the evidence the court of claims found that "the unsafe condition of the bridge, about which claimant had no knowledge, was the proximate cause of the accident, and the State is therefore morally bound, in view of all the facts and circumstances, to compensate claimant for his loss."

In support of his demurrer the defendant assigns, in substance, these grounds: (1) The appropriation is unconstitutional as a mere gift, amounts to a grant of the credit of the State in violation of Article X, Section 6, of the Constitution of West Virginia, and is null and void; (2) the construction and the maintenance of a state bridge are a governmental function and for that reason there can be no valid moral obligation of the State to compensate the petitioner for the damages which resulted to his property from the defective condition of such bridge; (3) the facts upon which the claim of the petitioner is based fail to disclose a moral obligation of the State to compensate the petitioner; (4) the facts upon which the claim is based show that the petitioner assumed the risk in using the bridge and that the proximate cause of its collapse was the overload on the truck; (5) no valid moral obligation exists to compensate the claimant because any recovery against the State, as a defendant in any proceeding to recover damages because of the defective construction or condition of any state road or bridge, is prohibited by Section 37, Article 4, Chapter 17 of the Code of West Virginia; and (6) no duty rests upon the State Road Commission to maintain highways and bridges under its jurisdiction "in more than reasonably safe condition for use in the usual manner by the ordinary methods of travel," and the State does not guarantee freedom from accidents to persons who travel such highways and bridges.

The substance of the first two grounds of demurrer was urged upon, and considered and rejected by, this Court in

*State ex rel. Davis Trust Company* v. *Sims,* 130 W. Va. 623, 46 S. E. 2d 90, and in *State ex rel. Catron* v. *Sims,* 133 W. Va. 610, 57 S. E. 2d 465, decided at this term of this Court. In each of those cases, the claim against the State for compensation, by reason of the existence of a moral obligation, was based upon the negligence of agents and employees of an agency of the State while engaged in the discharge of a governmental function and in both of them this Court recognized the existence of a valid moral obligation and awarded a writ of mandamus to compel the defendant, who is also the defendant in this case, to issue a warrant for the payment of the appropriation to satisfy the claim. Because of the binding authority of those cases it is unnecessary again to consider or discuss the obvious insufficiency of either of the foregoing two grounds of demurrer as a defense to the claim now under consideration in this proceeding.

The third and fourth grounds of demurrer are also without merit. The facts alleged in the petition, which upon demurrer must be taken as true, and as established by the evidence produced before the State Court of Claims, clearly show the negligence of the State Road Commission in the failure of its representatives to inspect, repair or condemn the bridge under its jurisdiction, or to post notices indicating to travelers upon the road the maximum load that could safely pass over the bridge at any one time. All these duties are expressly imposed by statute, Section 33, Article 4, and Section 35, Article 8, Chapter 40, Acts of the Legislature, 1933, First Extraordinary Session; and it is admitted that none of them was performed. The facts alleged and proved also show that the bridge was, and long had been, in an unsafe condition because of the rotten stringer beneath the floor of the bridge which did not safely support it, that the dangerous condition of the bridge had been reported to the representatives of the commission by persons in the neighborhood who were acquainted with that fact, and that the proximate cause of the collapse of the bridge which resulted in the damages to the truck of the petitioner was the negligence

of the agents and the employees of the commission, and not the load on the truck. The testimony shows clearly that the truck was not overloaded and that neither the petitioner nor the driver knew that the bridge over which the trucks of the petitioner had been driven for some time before the accident was unsafe or that the stringer which supported it was in a rotten condition; and nothing appears in the petition or in the proof upon which to base contributory negligence or assumption of risk, by the petitioner, as a defense to his claim.

In *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389, though it was held, upon the facts which there appeared, that the declaration of the Legislature did not constitute a valid moral obligation of the State and that the legislative appropriation, for the payment of the claim, being for a private purpose, was unconstitutional and void, this Court adopted a general rule by which a valid moral obligation of the State may be found to exist and a legislative appropriation of its public funds may be made to compensate a person who has a claim against the State which he can not enforce by any provision of positive law. The rule announced in the *Cashman* case, in which the two Judges, who now dissent, concurred, is stated in Point 4 of the syllabus in these words: "To constitute a valid declaration by the Legislature of the existence of a moral obligation of the State for the discharge of which there may be an appropriation of public funds in the interest of the public welfare, it is necessary, as a general rule, that there be an obligation or a duty, by prior statute created or imposed upon the State, to compensate a person for injury or damage sustained by him by reason of its violation by the State or any of its agencies, or to compensate him for injury, damage or loss incurred by him in or by his performance of any act authorized or required by such statute; or an obligation or a duty, legal or equitable, not imposed by statute, but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private

persons." The principle just stated was expressly recognized and approved, though not applied, in the subsequent cases of *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Bennett* v. *Sims,* 131 W. Va. 312, 48 S. E. 2d 13; and *State ex rel. Baltimore and Ohio Railroad Company.* v. *Sims,* 132 W. Va. 13, 53 S. E. 2d 505, the opinions in all of which were written by Judge Fox, and followed and applied in *State ex rel. Davis Trust Company* v. *Sims,* 130 W. Va. 623, 46 S. E. 2d 90; *State ex rel. Catron* v. *Sims,* 133 W. Va. 610, 57 S. E. 2d 465, decided earlier this term; and *State ex rel. Jordan* v. *Sims,* 134 W. Va. 167, 58 S. E. 2d 650, and *Saunders* v. *Sims,* 134 W. Va. 163, 58 S. E. 2d 654, decided simultaneously with the decision in this proceeding. In each of the four cases just cited, the rule of the *Cashman* case was applied in sustaining the validity of a moral obligation and an appropriation for its payment based on a claim for damages which resulted from the negligence of officers, agents or employees of agencies of the State while engaged in the discharge of a governmental function.

Application of the rule announced in the *Cashman* case, which is now again adhered to and reaffirmed as the settled law of this State, to the facts in this proceeding, renders necessary the conclusion that the moral obligation of the State declared by the Legislature to exist with respect to the claim of the petitioner and the appropriation made for its payment are valid unless prohibited by some applicable statute or principle of positive law. It is manifest that if the bridge over Copen Branch of Kanawha Two Mile Creek, in its unsafe and defective condition at the time it collapsed and damaged the truck of the petitioner, had been maintained or controlled by a private person or corporation, the person or the corporation so maintaining and controlling it would have been liable to the petitioner for the damages which he sustained, and that such liability could be established and enforced in an appropriate action at law in a court of competent jurisdiction. If the same bridge had been permitted, by a municipality required by its charter to keep

it in repair, or by a county court, instead of the State Road Commission, to become or remain out of repair, as this bridge unquestionably was, and long had been, at the time of the accident, the legal liability of the city or the county court for the damages which resulted could not be avoided or successfully denied. See Chapter 40, Article 10, Section 17, Acts of the Legislature, 1933, First Extraordinary Session, which amended the statute incorporated in the Code of 1931 as 17-9-33, and now appears in Michie's Annotated Code, 1949, as 17-10-17, serial section 1597 (9) ; *Cavender* v. *City of Charleston*, 62 W. Va. 654, 59 S. E. 732; *Rohrbough* v. *Barbour County Court*, 39 W. Va. 472, 20 S. E. 565, 45 Am. St. Rep. 925; *Wells* v. *County Court of Marion County*, 85 W. Va. 663, 102 S. E. 472. Though the liability of a municipality or a county court does not rest upon negligence but results from the breach of a duty imposed by statute with respect to a highway or a bridge under its control, *Rich* v. *Rosenshine*, 131 W. Va. 30, 45 S. E. 2d 499; *Roth* v. *City of Moundsville*, 118 W. Va. 283, 190 S. E. 332; *Thompson* v. *City of Charleston*, 118 W. Va. 391, 191 S. E. 547; *Campbell* v. *City of Elkins*, 58 W. Va. 308, 52 S. E. 220, 2 L. R. A. (N.S.) 159; *Boyland* v. *City of Parkersburg*, 78 W. Va. 749, 90 S. E. 347; *Chapman* v. *Milton*, 31 W. Va. 384, 7 S. E. 22, there is no difference in logic or in substance between the negligent acts and omissions of agents of the State Road Commission concerning the bridge over Copen Branch and identical or similar negligent conduct by agents of a city or a county court in regard to a bridge under its control which, if engaged in by them, would constitute a breach of the duty imposed by the statute upon a city or a county court and render it legally liable for the resultant injury or damage. In each instance the maintenance and the control of a public bridge require the discharge of a duty which arises in the performance of a governmental function. The difference in law between the two situations is that for the breach by a city or a county court of its duty to maintain a public bridge in repair, the Legislature may impose, and by valid statute has imposed, legal liability for damages which result, but for the breach of such duty by the

State or any of its constituent agencies, the Legislature can not constitutionally impose such liability.

There is a clear and valid distinction between the constitutional immunity of the State from suit, as provided by Article VI, Section 35 of the Constitution of this State, and the firmly established rule that the State, unless it has assumed liability by constitutional mandate or can and does assume it by valid legislative enactment, is not liable by positive law for injuries caused by the negligence or other tortious acts or conduct of its officers, agents or employees while engaged in the discharge of a governmental function. This distinction is discussed in 49 Am. Jur., States, Territories, and Dependencies, Section 76, in this language:

"The rule is well settled that the state, unless it has assumed such liability by constitutional mandate or legislative enactment, is not liable for injuries arising from the negligent or other tortious acts or conduct of any of its officers, agents, or servants, committed in the performance of their duties. In other words, the doctrine of respondeat superior does not apply to sovereign states unless through their legislative departments they assume such liability voluntarily.

"While there is authority to the contrary, the general rule is that the exemption of the state from liability for torts of its officers and agents does not depend upon the state's immunity from suit without its consent, but rests upon grounds of public policy which deny the liability of the state for such damages. It is based upon the sovereign character of the state and its agencies, and the absence of obligations on the part either of the state or such agencies, and not upon the ground that no remedy has been provided. Under this general rule a state is not answerable in damages for injuries sustained by, or the death of, a convict in prison through the negligence of the prison officers, in the absence of any voluntary assumption of liability."

The State or any of its constituent agencies, in the exercise of its sovereign powers and in the performance of its

duties, is generally engaged in the discharge of a governmental function. The governmental character of its acts in the discharge of its duties is the same whether the duties are created by contract or are imposed by constitutional or valid statutory provisions. By virtue of the firmly established and universally recognized principle that the State and its political subdivisions are not legally liable to any person for damages which result from a tort committed by their agents while engaged in the discharge of a governmental function, which principle, with respect to the State, can not be altered or rendered inoperative by statute, and by virtue of the constitutional provision that the State shall never be made a defendant in any court of law or equity, except as a garnishee or a suggestee in a garnishment or an attachment proceeding, Article VI, Section 35, Constitution of West Virginia, no remedy exists by positive law against it in favor of any person who is wronged or damaged by the negligent acts of its officers, agents or employees. This situation, with respect to a claim against the State or one of its constituent agencies, gives rise to and justifies the doctrine that a moral obligation, based upon the theory of justice and fair treatment of one of its legally remediless subjects who has suffered injury or damage at the hands of his sovereign, may be voluntarily declared by the Legislature to exist in his favor and an appropriation of public funds may be voluntarily made by that separate and independent branch of the State Government to pay his claim when the Legislature finds it to be fair and just and approves it as such by action which, in every instance, is subject to judicial review by this Court in a proper proceeding to determine its validity. A valid moral obligation amounts to this and to this only. In consequence, a claimant, who is without a positive legal remedy and who seeks compensation from the State by means of a moral obligation, does not sue the State or make it a defendant in any court of law or equity, or make it a defendant in any proceeding for the recovery of damages for any purpose. In seeking the relief which may or may not be afforded by means of a moral obligation, a claimant can not demand, but can

only request, that the Legislature directly, or upon the recommendation of its creature and special instrumentality, the State Court of Claims, grant him the compensation which he claims. This the Legislature, as a matter of grace, and not as a matter of right, may or may not do. See *Woodall* v. *Darst*, 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L. R. A. (N. S.) 83; Ann. Cas. 1914 B, 1278; *Slack* v. *Jacob*, 8 W. Va. 612. If his claim is denied he has no further remedy. If it is granted, and its payment is refused, he still has the burden of sustaining its validity in a proper proceeding in this Court. *State ex rel. Cashman* v. *Sims*, 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389.

It is insistently urged, in support of the fifth ground of demurrer, that no moral obligation may be declared to exist with regard to the claim of the petitioner by reason of the statute, Section 37, Article 4, Chapter 40, Acts of the Legislature, 1933, First Extraordinary Session, which provides that the State shall not be made a defendant in any proceeding to recover damages because of the defective construction or condition of any state road or bridge. This statute with respect to a state road or bridge merely gives legislative expression to the broad general provisions of Section 35 of Article VI of the Constitution that the State of West Virginia shall never be made defendant in any court of law or equity except as garnishee or suggestee in a garnishment or an attachment proceeding and operates as a declaration of general legislative policy relating to a state road or bridge as a matter of positive law. It should not be construed to mean that a claim arising from the defective condition of a state road or bridge, which is unenforceable under any provision of positive law, can not be made the basis of a valid moral obligation which the Legislature may voluntarily find and declare to exist against the State.

In presenting to the Legislature, or its special instrumentality, the State Court of Claims, a claim for consideration on the basis of a moral obligation, the claimant does not make the State a defendant in a proceeding to recover damages within the meaning of the statute which

relates to a judicial, not a legislative, proceeding for that purpose. The action of the Legislature and of the court of claims in approving or rejecting claims presented to either involves the exercise of a legislative, not a judicial, function. In finding and declaring, by the enactment of a statute, that a moral obligation of the State, based upon facts which give rise to a juristic condition, exists, the Legislature performs a legislative function, but the determination of the validity of such obligation, which involves the constitutionality of the statute, is a judicial, not a legislative, function. *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389.

The action of the Legislature, in approving a claim against the State for damages, which can not be enforced or recovered by positive law, in declaring it to be a moral obligation of the State, and in making an appropriation for its payment, is legislative in its nature; but when the person in whose favor the moral obligation has been declared and the appropriation to pay it has been made, institutes a judicial proceeding in this Court, to sustain such action of the Legislature, against a defendant who challenges it as unconstitutional, null and void and refuses to obey the legislative direction to issue a warrant for the payment of the appropriation to satisfy the claim, the question of the validity of the moral obligation and of the legality of the appropriation for its payment is judicial and involves the exercise of a judicial function. Any other conclusion would render unconstitutional the statute which creates the State Court of Claims and empowers it to consider and allow claims within the jurisdiction conferred upon it, as a special instrumentality of the Legislature, and to recommend their approval and payment by the Legislature, Chapter 20, Acts of the Legislature, 1941, Regular Session, as amended by Chapter 39, Acts of the Legislature, 1945, Regular Session, and would condemn as erroneous the numerous decisions of this Court which, since *Slack* v. *Jacob,* 8 W. Va. 612, have recognized the power of the Legislature to declare a moral obligation of the State and to appropriate funds with

which to pay it, when to do so is not required by positive law but is just and equitable. If, however, Section 37, Article 4, Chapter 40, Acts of the Legislature, 1933, First Extraordinary Session, should be considered as having been originally intended by the Legislature to apply to claims against the State for damages caused by the defective construction or condition of a state road or bridge, which may be satisfied only by means of a moral obligation, its operation and effect, with respect to such claims, have been removed by the subsequent enactment of Chapter 20, Acts of the Legislature, 1941, Regular Session, as amended by Chapter 39, Acts of the Legislature, 1945, Regular Session, a general statute, which creates the State Court of Claims "for the purpose of considering claims against the state, which because of the provisions of section thirty-five, article six of the constitution of the state, and of statutory restrictions, inhibitions or limitations, cannot be heard in a court of law or equity," Section 4, and extends its jurisdiction to "Claims and demands, liquidated and unliquidated, *ex contractu* and *ex delicto*, against the state or any of its agencies, which the state as a sovereign commonwealth should in equity and good conscience discharge and pay." Section 13.

The sixth ground of demurrer, that the State does not guarantee freedom from accidents to persons who travel upon bridges and highways under its supervision and control and that no duty rests upon it to maintain them "in more than reasonably safe condition for use in the usual manner and by ordinary methods of travel" does not apply to the facts alleged in the petition, and for that reason it is not well founded. Of course the State does not guarantee freedom from accident to persons who travel upon its bridges or highways and there is no duty, imposed by positive law, that it keep them in even a reasonably safe condition for travel upon them; but that is no reason, in logic or in justice, why it should not recognize a moral duty to keep them in the repair which its Legislature, by positive law, requires of municipalities and county courts in regard to streets and bridges and highways and bridges

under their control. A person who is killed as the result of the failure of a city or a county court to keep a city or a county controlled bridge or highway in repair, and whose personal representative can, by positive law, recover damages from a municipality or a county court for his wrongful death, would be just as effectively killed if his death resulted from the same defective condition of a bridge or a highway under the control of the State. That the personal representative of the decedent has no cause of action against the State and no legal right to recover damages from it is not a sound or sufficient reason to deny the power of the Legislature voluntarily to declare a moral obligation in favor of a citizen whose life it has taken through the negligence of its agents or voluntarily to make an appropriation as compensation for its wrong. On the contrary, a situation such as that just outlined and other situations similar in principle, whether they arise from a contract or from a tort, form the very basis for the doctrine of a moral obligation upon the part of the State and justify its recognition by the courts. As stated by this Court in *State ex rel. Davis Trust Company* v. *Sims*, 130 W. Va. 623, 46 S. E. 2d 90, in which Judge Fox concurred, and as repeated in *State ex rel. Bennett* v. *Sims*, 131 W. Va. 312, 48 S. E. 2d 13, in the opinion prepared by him: "The general principle, recognized by this Court, that in the absence of a valid statute or a constitutional provision assuming or imposing liability upon it, a State is not liable for the tortious acts of its officers, agents and employees, relates to legal liability, and denies the existence of any such liability as a result of the wrongful acts of its representatives. It does not operate to prevent the recognition of a moral obligation of the State arising from or predicated upon the misconduct of its officers, agents and employees, such as would be judicially held to constitute a breach of a legal duty in cases between private persons."

The facts alleged and proved with respect to the claim of the petitioner bring it within that part of the general rule of the *Cashman* case which justifies and sustains the

declaration of a valid moral obligation of the State and a legislative appropriation for the payment of the claim on which such obligation is based, when there is "an obligation or a duty, legal or equitable, not imposed by statute but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons."

It is asserted that the recognition by this Court of a moral obligation of the State, declared by the Legislature, for the payment of a claim for damages caused by the negligence of its officers, agents or employees with respect to a state controlled bridge or highway, would open the door to a veritable flood of such claims, would result in raids upon the treasury of the State, and would lead to the dissipation of the public funds of the State. This argument is not only specious but is wholly unsound. It proves too much. It overlooks the relative positions of a claimant who is injured by the negligence of a private person and a claimant who is injured by similar conduct of representatives of the State. The first claimant, by positive law, has an enforceable claim against his wrongdoer which he can prosecute as a matter of right in any court of competent jurisdiction. On the contrary, the second claimant has no legal right and, instead of proceeding in a court of law, must, in reality, call upon the Legislature to compensate him purely as a matter of grace. He is completely subject to its voluntary action, whatever it may be. If his claim is just, the Legislature, unlike a court, may still reject it for reasons of policy, or for no reason at all. His road to ultimate compensation is filled with difficulty and uncertainty. If the Legislature approves his claim as fair and just when it is not, or is otherwise improper, its payment will not be authorized by this Court. *State ex rel. Cashman* v. *Sims*, 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389; *State ex rel. Adkins* v. *Sims*, 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Bennett* v. *Sims*, 131 W. Va. 312, 48 S. E. 2d 13. Even if the number of such claims becomes disproportionately large, in comparison with the number of claims under positive law for negligent injuries,

which seems entirely unlikely, no such claim should be rejected solely for that reason. It may as well be said that, because there are too many claims for a court to hear, none should be heard or allowed. Should the number, however, become excessive and the amounts burdensome, the Legislature could, and undoubtedly would, put the quietus on all such claims by abolishing the court of claims, or by refusing to approve or pay claims against the State, which latter action would make impossible the payment of any such claim. The argument, moreover, assumes, without any justification whatever, that the Legislature, in making appropriations for the payment of moral obligations declared by it, would fail to safeguard the financial interest and welfare of the State and thus, in effect, violate the Constitution of West Virginia. Why, may it be asked, should this Court entertain the assumption that the Legislature, a separate and independent department of the State Government, directly responsible to the electorate and which, by the Constitution, is vested with, and from the formation of this State has exercised without doubt or distrust, the plenary power, except as limited by constitutional provisions, of appropriating public funds, is not to be trusted or is to be regarded with suspicion in the use of its power to appropriate such funds, and in the performance of its duties, with respect to moral obligations which it may voluntarily declare? It is axiomatic that this Court can not engage in or consider any such assumption. It is not within the province of the judiciary to inquire into the motives which actuate the Legislature in enacting a statute and it will always be conclusively presumed that it has acted in good faith and from a proper motive. 16 C. J. S., Constitutional Law, Section 100 (a); 12 C. J., Constitutional Law, Section 224. In *Coal and Coke Railway Company* v. *Conley and Avis,* 67 W. Va. 129, 67 S. E. 613, this Court said: "Neither ignorance, stupidity, corruption nor motives improper in any sense can be imputed to the legislature by the courts. This rule is necessary to the preservation of the legislative province." It is also presumed that the Legislature knows the limitations imposed upon its power by the Constitution. *Eureka Pipe*

190

*Line Company* v. *Hallanan,* 87 W. Va. 396, 105 S. E. 506, reversed on other grounds, 257 U. S. 265, 42 S. Ct. 101, 66 L. ed. 227. "Courts will not presume fraudulent intent and corrupt purposes on the part of the Legislature, but will presume the contrary." Point 10, Syllabus, *Slack* v. *Jacob,* 8 W. Va. 612. In appropriating money for the payment of any moral obligations which it may declare, the tremendous responsibility of safeguarding the appropriation of the funds of the State rests upon the Legislature and this Court must presume that it will faithfully discharge that trust in the interest of the State.

It is also urged that the principle by which a moral obligation of the State may be recognized should be restricted to instances in which there is a prior statute or in which services are rendered to or goods or money are received by the State. Of course those situations may give rise to a valid moral obligation. See *Woodall* v. *Darst,* 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L. R. A. (N. S.) 83, Ann. Cas. 1914B, 1278; *Glover* v. *Sims,* 121 W. Va. 407, 3 S. E. 2d 612; and *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389. The contention that the doctrine should be so limited is logically inconsistent and rests upon a misconception of the underlying reason for its existence or recognition in any case. That position would sustain a moral obligation of the State for the wrongful conversion of the property of a claimant by an agent of the State if the State appropriated it to its own beneficial use, but would reject such obligation if the agent of the State entirely destroyed the property or merely injured it and in consequence the State derived no advantage from its wrongful act. In each instance the subject has been wronged by his sovereign; but in the one the sovereign may voluntarily compensate him and in the other it may not do so. No more need be said to demonstrate the utter fallacy of the argument thus advanced except the statement that the only sound basis for the doctrine and the only real justification for its existence in any situation are not the enrichment of the State, but the just and equitable treatment of its legally remediless subject

for the wrong which it has committed against his person or his property.

For the reasons stated the writ, as prayed for, is awarded.

*Writ awarded.*

Fox, JUDGE, dissenting:

I find myself unable to concur in the decision of the majority in this proceeding. I have come to the conclusion that an act of negligence by an officer, agent, servant or employee of the State, arising out of the performance of a purely governmental function, in connection with high-way maintenance, does not furnish a sound basis for a legislative finding of a moral obligation, on the part of the State, to compensate a person who suffers injury to his person or property by reason of such negligence or au-thorize the appropriation of public funds of the State to provide for the payment of such compensation. I concede that this position departs from principles laid down in certain recent decisions of this Court, in which I partici-pated, and from which holdings I did not dissent, the latest being *State ex rel. Catron* v. *Sims, Auditor,* 133 W. Va. 610, decided at this term. However, mature consid-eration of the question now convinces me that such de-cisions can not be supported in logic or sound reasoning. Having stated that much, I think it appropriate to discuss the cases which have been decided by this Court on ques-tions of moral obligation of the State, and to point out the danger of the application of the principles heretofore announced to acts of simple negligence on the part of officers, agents, servants or employees of the State in con-nection with the construction and maintenance of the highways of the State. I offer no apology for my present views, and the gratuitous emphasis placed on the position taken by me in other cases does not affect me. I have not sought to evade my responsibility, in part, for those holdings.

The basis, and supposed necessity, of the principle that a Legislature may appropriate money to redeem a moral obligation of the State, arises from the provisions of

Section 35, Article VI, of the Constitution of this State, which now reads:

"The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any sub-division thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee."

The effect of these provisions was, of course, to close the courts of the State to any suit, action or proceeding, the purpose of which would be to impose liability upon the State of any character, except in garnishment or attachment proceedings. It follows, therefore, that should a case arise wherein a person suffers damage through an agency of the State or the negligence of its employees, the only resort would be to that division of the State government which has control of its public funds, and power to appropriate the same for a public purpose. This is the basis of the moral obligation theory which, with increasing frequency, has been advanced in recent years.

While the question has recently become more important, it was raised early in the history of the State in the case of *Slack* v. *Jacob,* 8 W. Va. 612. The Legislature appropriated a sum of money to meet the cost of removing the records and archives of the State from Charleston to Wheeling, shortly after the adoption of our present Constitution, which provided that:

"The Seat of Government shall be at Charleston, until otherwise provided by law."

The Legislature, at its 1875 session, passed an act to remove the seat of government temporarily to Wheeling, and following that enactment the records, papers and archives of the State were removed to Wheeling, involving some expense which the State was undertaking to assume and pay. By the act of removal of the Capital, the Governor was authorized to cause suitable accommodations to be prepared in the City of Wheeling for the several departments of the State government, and to remove

thereto the public records and other State property then in the City of Charleston to the City of Wheeling. It was argued that one of the provisions of Section 38 of Article VI of the Constitution which provided:

"* * * nor shall any Legislature authorize the payment of any claim or part thereof, hereafter created against the State, under any agreement or any contract made, without express authority of law; and all such unauthorized agreements shall be null and void."

did not authorize such a contract. In that connection, the Court said:

"But whether it does authorize such contract, or not, it is not uncommon for persons to supply the needs of the government or its different departments without contracts, relying on the voluntary justice of the State to pay reasonably therefor. And such transactions have been regarded as not within the true meaning of the said thirty-eighth section, and such voluntary payments have been made with the approval of all departments of the government. According to our understanding, that part of the said thirty-eighth section only applies to claims based on agreements or contracts made without express authority of law, and the section declares such unauthorized agreements null and void. It does not apply to claims predicated upon simple justice and right, and never was intended to prevent the Legislature from voluntarily doing justice and right where the claim is not predicated on a contract made without express authority of law. An opposite construction, it seems to us, would be against the spirit and policy of the provision itself, if not its very letter, and would necessarily operate great evil and injury in the daily as well as periodical operations, of the government in its different departments; and would in fact, necessarily greatly embarrass, if not completely obstruct, the successful operation of the government, which was not intended by said section."

It will be observed that the situation with which the Court was then dealing was a matter of contract, express or implied, through which the State would receive bene-

fits, and, which, we may assume, created a moral obligation to pay a fair compensation for any services rendered. There was not involved in that case, and there is no reference therein, to any obligation of the State to compensate for the negligent act of any officer, agent, servant or employee of the State. I think the case of *Slack* v. *Jacobs, supra,* should be interpreted as applying to the situation then presented to the Court, and not be treated as the basis for creation of a moral obligation in distinguishable situations.

The next case in which the subject of moral obligation was considered was that of *Woodall* v. *Darst,* 71 W. Va. 350, 80 S. E. 367. It was there held that the Legislature was without the power to levy taxes or appropriate public revenues for purely private purposes; but that it had power to make an appropriation to a private person in the discharge of a moral obligation of the State, and that such an appropriation was for a public and not a private purpose. In that case the moral obligation was supposed to arise from an injury sustained by a member of the West Virginia National Guard who was injured while on duty. There was no question of the negligence of any officer, agent, servant or employee of the State. Furthermore, there was a statute in existence which provided that provision should be made for any member of the national guard who might become incapacitated while on duty, "or who shall without fault or neglect on his part be wounded or disabled while performing any lawfully ordered duty.", and it was held that this policy, and the provisions quoted, covered the case of the petitioner in that proceeding.

The next case was that of *Glover* v. *Edgar B. Sims, Auditor,* 121 W. Va. 407, 3 S. E. (2d) 612. That was a case where the Legislature had appropriated money "for full payment of all outstanding open accounts of the Athletic Department of West Virginia University, to be expended as the Board of Control may direct." It was developed in that proceeding that the athletic department of the University had contracted debts for services and supplies fur-

nished to it of which the people of the State had accepted the benefit, and it was held that, in such circumstances, the Legislature could declare the same to be a moral obligation of the State and appropriate money to meet the cost thereof.

It will be observed that up to this point the theory of moral obligation had never been applied to cases of negligence of any character, on the part of any officer, agent, servant or employees of the State. But in the case of *State ex rel. Cashman* v. *Edgar B. Sims, Auditor,* 130 W. Va. 430, 43 S. E. (2d) 805, decided in 1947, a claim based in part on alleged negligence of the State was presented. Cashman, while employed as a physician in Hopemont Sanitarium, an institution for the treatment of tubercular patients, contracted tuberculosis. It is not clear that he based his claim upon any allegation of any particular act of negligence on the part of the State or its employees, but the case did present an opportunity to define the limits to which the Legislature might go in appropriating public funds, and it was there held that:

> "To constitute a valid declaration by the Legislature of the existence of a moral obligation of the State for the discharge of which there may be an appropriation of public funds in the interest of the public welfare, it is necessary, as a general rule, that there be an obligation or a duty, by prior statute created or imposed upon the State, to compensate a person for injury or damage sustained by him by reason of its violation by the State or any of its agencies, or to compensate him for injury, damage or loss incurred by him in or by his performance of any act authorized or required by such statute; or an obligation or a duty, legal or equitable, not imposed by statute, but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons."

In that case, it was found that the facts did not, under the rule therein announced, authorize the appropriation sought to be enforced in that case.

The next case was that of *State ex rel. Davis Trust Co.,*

*Admr., etc.* v. *Edgar B. Sims, Auditor,* 130 W. Va. 623, 46 S. E. (2d) 90. In that case, the officers and agents of the State, in control of a prison, permitted an inmate, convicted of murder, to have certain privileges, resulting in the murder of an aged lady by such inmate, and an award of compensation, to her personal representative, based upon a legislative declaration of a moral obligation to pay the same, was upheld by this Court, ostensibly, on the theory of the negligence of the officers and agents of the State. There was a dissent from that decision by Judge Lovins. It may be that the holding in that case sustained the theory that the Legislature has authority to appropriate public funds to compensate for negligence on the part of officers and agents of the State.

The next case considered was that of *State ex rel. Adkins, Admr., etc.* v. *Edgar B. Sims, Auditor,* 130 W. Va. 645, 46 S. E. (2d) 81. That case involved the death of six persons when an automobile in which they were travelling went over a precipitous bank on a state highway, and it was contended that this event resulted from the failure of the State to properly construct and maintain guard rails along the highway, provide markers, and paint a center line thereon at that point. It may be argued that these contentions involved a claim of negligence on the part of the State Road Commission, and its employees, in failing to provide such guard rails, markers and painting of such center line. In that case, we held that:

> "The failure of the state road commissioner, in the exercise of the discretion vested in him to expend public moneys, appropriated by the Legislature for the construction, maintenance and repair of the public highways of this State, to provide guard rails, place road markers or danger signals, and paint center lines on paved highways, at a particular point on any highway in this State, does not create a moral obligation on the part of the State to compensate a person injured on such highway, allegedly resulting from such failure."

It was held in that case that the failure to provide guard rails, place road markers, and paint center lines on the

paved portion of the highway did not constitute negligence, but it is stated in the body of the opinion that in making this holding:

"We do not mean to say that situations may not arise where the failure of the road commissioner properly to maintain a highway, and guard against accidents, occasioned by the condition of the road, may not be treated as such positive neglect of duty as to create a moral obligation against the State, for which the Legislature may appropriate money to pay damages which proximately resulted therefrom. But this is not such a case. * * *"

In the case of *State ex rel. Bennett,* v. *Sims, Auditor,* 131 W. Va. 312, 48 S. E. (2d) 13, Bennett was injured by an explosion of dynamite while engaged as an employee of the State Road Commission, and while working on a State highway. In this case the rule in the *Cashman* case was adopted and applied. It was there held:

"Injuries sustained by an employee of the State, in the course of his employment, in circumstances which would entail liability for damages on a negligent private employer, in an action therefor, may provide the basis for a declaration of a moral obligation on the part of the State to compensate such employee for his injuries, and justify a legislative appropriation for that purpose."

This, of course, is a clear use of the doctrine laid down in the *Cashman* case. It was held that the facts did not warrant the appropriation made to Bennett, and the writ which would have made such appropriation effective was denied. Judges Kenna and Riley dissented, being of the opinion that the facts and circumstances of the case justified the issuance of the writ.

As stated earlier in this dissent, the cases based on alleged negligence, referred to above, plainly recognize the power of the Legislature to appropriate public funds to compensate persons injured in their person or property through the negligent acts of officers, agents, servants and employees of the State; and the *Cashman* and *Bennett* cases, in particular, adopted the principle that such appro-

priation can be made if in similar litigation between private persons a recovery could be had. Each member of this Court who joined in those decisions is, in part, responsible therefor. However, recent developments, evidenced by the case at bar, and others submitted at this term, convince me that, in so far as the rule laid down in the *Cashman* case creates the test for legislative appropriations as being, in all cases, that existing between private litigants, the same is erroneous, and ought to be reconsidered. A moment's thought will convince anyone that the position of the State as a litigant, even if the constitutional immunity of the State from suit or action were removed, would be entirely different from that of private litigants. Private litigants have no immunity from suit as between each other. In private litigation, if it be shown that a negligent act has been committed, and injury results therefrom, the injured person is entitled to recover damages; whereas, between a private litigant and the State, if an action between them were possible, under our Constitution, there could be no liability imposed on the State for the negligent acts of its officers, agents, servants and employees, while engaged in the performance of a purely governmental function. That principle was last announced by this Court in the case of *Hayes* v. *The Town of Cedar Grove, etc.*, 126 W. Va. 828, 30 S. E. (2d) 726, and is recognized as settled law in this State. This being true, the test laid down in the *Cashman* case cannot be properly applied to a case involving negligence on the part of an officer, agent, servant or employee of the State. It may be proper to apply it to other cases wherein charges of negligence are not involved.

The general theory of the *Cashman* case has given rise to the belief that the Legislature has plenary power to make appropriation of public funds to compensate individuals who suffer injury and damage by reason of the negligent acts of the officers, agents, servants and employees of the State; and the claim has been so far extended as to include alleged negligence in maintaining the highways of the State. This theory is in direct con-

travention of the express provisions of Section 37, Article 4, Chapter 40, Acts of the Legislature, First Extraordinary Session, 1933, (1949 Michie's Code, 17-4-37), which reads: "The State shall not be made the defendant in any proceeding to recover damages because of the defective construction or condition of any state road or bridge.", although it is fair to state that Section 33 of the same Article provides that: "The commissioner shall inspect all bridges upon state roads. If any bridge is found to be unsafe, the commissioner shall promptly condemn, close and repair it." The language employed is plain and simple and cannot be explained away as is attempted to be done in the majority opinion, or nullified by the creation of the Court of Claims. Of course, the failure to inspect a bridge at reasonable intervals might be termed negligence, for which, under general law, there could be no recovery against the State, both by reason of constitutional immunity against suit or action, and the rule that a governmental body is not liable for the negligent acts of its officers, agents, servants and employees while engaged in the performance of purely governmental functions. These rules are not new. The immunity of the sovereignty against being called into its own court to answer for breaches of contract or for a tort was fully established at common law, and the principle is one of the landmarks of the law.

The majority decision in this case supports the proposition that while a person injured through the negligent act of an officer, agent, servant or employee of the State may not recover damages for such negligence, if the same arises from his performance of a purely governmental function, nevertheless, the Legislature may appropriate public moneys to compensate persons so injured. Of course, such a claim cannot be tested in courts until the State's constitutional immunity from suit or action is removed. If the State's constitutional immunity from suit or action should be removed, and the right of individuals to sue the State recognized, there could be no recovery in the courts of the State for acts of negligence on the

part of officers, agents, servants and employees of the State while engaged in the performance of purely governmental functions, unless the rule against liability for such negligence was also destroyed by legislative act or otherwise; and yet in the absence of any such change in our Constitution, we permit these constitutional and legal inhibitions to be completely nullified, by indirect methods, on the theory of a moral obligation.

I do not believe it has ever been the intention of the Legislature of this State, even if it had the power to do so, to assume liability for negligence of employees of the State, and, particularly, the employees of the State Road Commission, in the construction and maintenance of the highways of this State, yet the rule announced in the majority opinion, if followed by the Legislature, will inevitably lead to that result. The appalling loss of life and damage to property, resulting from highway accidents in this State, ought to cause responsible public officials of the State to pause in the application of doctrines which inevitably lead to the assumption of full responsibility by the State for negligence of State employees who are connected with our highway system. It is public knowledge that accidents, many times involving loss of life, are occurring every day of the year in this State. These accidents may be attributed to different causes, but in many cases they may be fairly attributed to the condition of the highway. The fact that the driver of an automobile may himself be negligent does not preclude a claim before the Legislature that it was not his negligence that caused the accident and damage, but the condition of the highway caused by the negligent act of some State employee. Of course, each case would have to stand upon its own facts; but experiences so far have not created the impression that the Legislature would be too strict in the application of rules of law which ordinarily prevail when negligence cases are brought before the courts of the State. In saying this I do not mean to reflect on the Legislature. I am merely recognizing one of the "facts of life." I do not accept as permissible the obvious pur-

pose of the majority opinion to charge those not agreeing therewith with lack of confidence in the Legislature to honestly perform its duty. I regret that such suggestion has been made, as well as the language employed in making it. In effect, we are permitting the Legislature to supersede the courts in the determination of liability for negligence in all cases where the courts are powerless to grant relief under constitutional, statutory or general law. This amounts to the exercise of judicial power by the Legislature, in plain violation of constitutional provisions respecting the powers of the separate branches of our State government.

In the case at bar, there is evidence which tends to show negligence on the part of employees of the State Road Commission in failing to inspect and keep in repair the bridge where the damage to claimant occurred. I raise no question on that point. My point is that the Legislature does not possess the power to declare that the negligence of an officer, agent, servant or employee of the State can be made the basis of a declaration of a moral obligation of the State to pay a claim, which, under well recognized rules of constitutional and statutory law, and the decisions of this Court cannot be made the subject of recovery by any suit, action or proceeding against the State. In this connection, I do not believe that the Legislature can, by an act for the special benefit of a particular person, repeal by implication, or otherwise, a general act embodying the general policy of the State, and in so doing nullify a constitutional provision.

It is idle to say that the proceeding in the case at bar is not, in effect, a proceeding against the State. In *Mahone* v. *The State Road Commission of West Virginia*, 99 W. Va. 397, 129 S. E. 320, it was held that:

> "The State Road Commission of West Virginia is a direct governmental agency of the State, and as such is not subject to an action for tort."

In *Stewart* v. *The State Road Commission of West Virginia*, 117 W. Va. 352, 185 S. E. 567, it was held that:

> "The constitutional immunity of the state from
> suit extends to its governmental agencies. * * *"

No one will contend that the Auditor of the State does
not perform a governmental function, or is not an agent
of the State having control of its public funds. The pres-
ent proceeding is one which directly involves the State,
inasmuch as it seeks to compel the State Auditor to rec-
ognize a requisition which withdraws money from the
State Treasury. If the statutory provisions, cited above,
to the effect that the State shall not be made the defend-
ant in any proceeding to recover damages because of the
defective condition of any State road or bridge means
anything, it means that the State may not, through a
mandamus proceeding, be compelled to deplete its treas-
ury by the payment of claims arising from defective con-
ditions of any State road or bridge.

I think the time has come to face anew the application
of the doctrine of moral obligation to alleged negligent
conduct on the part of the State and its agencies, in re-
spect, particularly, to claims based on alleged negligence
of the State Road Commission and its employees. It may
be that the constitutional provision inhibiting the State
from being made the defendant in any of the courts of
the State, is an unwise provision, and should be discarded
for one which will permit suits against the State by citi-
zens, allegedly wronged by negligent conduct of agents
and employees of the State. But, if this were done, there
could be no recovery on claims of such negligence, so long
as the rule of law that a State is not liable for the negli-
gence of its officers, agents, servants and employees while
engaged in the performance of a purely governmental
function remains in force. If the constitutional inhibition
was removed, the power of the Legislature to authorize
suits or actions against the State, and to change the rule
so as to allow recovery for negligence in the performance
of governmental functions would be full and complete.
If that were done, then claims for damages could be set-
tled in the courts of the State as disputes between private
litigants are settled in such courts. But, until these

changes are made, it seems to me that the safe and sound rule is to apply the Constitution as it is written, and to apply legal rules as they are settled and established. There is no halfway position which we can take with any logic or consistency; either we must hold, as settled law, that the State cannot, under any pretense, compensate citizens for acts of negligence on the part of its agents and employees, or go to the other extreme and permit the Legislature to appropriate money for every negligent act committed by an employee of the State, which the Legislature may think justifies an award of compensation. This Court has attempted to retain some control over this character of appropriations under the theory that when a situation becomes judicial in its nature, it has power to overrule the finding of the Legislature. I do not think that this asserted power is sufficient to control the situation as it now is, and as it promises to be in the future.

The questions involved in this case are among the most important with which this State is confronted at the present time. There never will be a time when it will be possible to keep the highways, including bridges, in an absolutely safe condition. Accidents are bound to happen, as is evidenced by the continuing record of disaster pictured in the press from day to day. I do not deem it a wise policy for the State ever to assume full responsibility for the condition of the highways. I think the Legislature has plainly said that the State is not liable for accidents due to the condition of its highways. The general law is that the State is not liable for negligent acts of its servants and employees performing governmental functions. Yet in the face of what the Legislature has enacted, and in the face of controlling legal rules, it is now embarking upon a policy, approved by this Court, of allowing compensation for every mishap on the public highways of this State, due in any degree to the negligence of a State employee, for which, at the moment, it seems appropriate to compensate for, by the use of public funds. I think the course laid down by the majority opinion in this case involves grave consequences as it effects public funds

in the State Treasury, and by this dissent I register my protest against it.

I am authorized to state that Judge Lovins joins in this dissent.